UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| SHERYL FIFE, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff*, | **COMPLAINT—CLASS ACTION** |
| v. | |
| SCIENTIFIC GAMES CORP., a Nevada corporation, | **JURY DEMAND** |
| *Defendant*. | |

Plaintiff Sheryl Fife brings this case, individually and on behalf of all others similarly situated, against Defendant Scientific Games Corp., ("Scientific Games" or "Defendant") to enjoin its operation of illegal online casino games. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and upon information and belief, including investigation conducted by her attorneys, as to all other matters.

## NATURE OF THE ACTION

1. Defendant Scientific Games owns and operates a video game development company in the so-called "casual games" industry—that is, computer games designed to appeal to a mass audience of casual gamers. Amongst the games Defendant owns and operates, is a host of popular online casino games, including, *inter alia,* Jackpot Party Casino, and Gold Fish

COMPLAINT—CLASS ACTION
Case No.
- 1 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1. Casino.

2. Defendant offers a multitude of electronic versions of slot machines to consumers. Consumers can play Defendant's online casino games on Android, Apple iOS devices, and Facebook.

3. Defendant provides a bundle of free "chips" to first-time visitors of its online casinos that can be used to wager on its games. After consumers inevitably lose their initial allotment of chips, Scientific Games attempts to sell them additional chips starting at $4.99 for 20,000,000 chips. Without chips, consumers cannot play the gambling game.

4. Freshly topped off with additional chips, consumers wager to win more chips. The chips won by consumers playing Defendant's games of chance are identical to the chips that Defendant sells. Thus, by wagering 20,000,000 chips that were purchased for $4.99, consumers have the chance to win hundreds of thousands of additional chips that they would otherwise have to purchase.

5. By operating its online gambling games, Defendant has violated Washington law and illegally profited from tens of thousands of consumers. Accordingly, Sheryl Fife, on behalf of herself and a Class of similarly situated individuals, brings this lawsuit to recover their losses, as well as costs and attorneys' fees.

**PARTIES**

6. Plaintiff Sheryl Fife is a natural person and a citizen of the state of Washington.

7. Defendant Scientific Games, Corp., is a corporation organized and existing under the laws of Nevada, with its principal place of business at 6601 Bermuda Road, Las Vegas, Nevada 89119. Defendant conducts business throughout this District, Washington State, and the United States.

**JURISDICTION AND VENUE**

8. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the

COMPLAINT—CLASS ACTION
Case No.
- 2 -
TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

exceptions under that subsection apply to this action.

9. The Court has personal jurisdiction over Defendant because Defendant conducts significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

10. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. Free-to-Play and the New Era of Online Gambling

11. The proliferation of internet-connected mobile devices has led to the growth of what are known in the industry as "free-to-play" videogames. The term is a misnomer. It refers to a model by which the initial download of the game is free, but companies reap huge profits by selling thousands of "in-app" items that start at $0.99 (purchases known as "micro-transactions" or "in-app purchases").

12. The in-app purchase model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2017, free-to-play games of chance generated over $3.8 billion in worldwide revenue, and they are expected to grow by ten percent annually.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[2]

13. With games of chance that employ the in-game purchase strategy, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

"If you hand someone a closed box full of promised goodies, many will happily

---

[1] GGRAsia – Social casino games 2017 revenue to rise 7pct plus says report, http://www.ggrasia.com/social-casino-games-2017-revenue-to-rise-7pct-plus-says-report/ (last visited Apr. 17, 18)

[2] *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat*, https://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Apr. 17, 18)

COMPLAINT—CLASS ACTION
Case No.

- 3 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

14. Another stated:

"Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

15. The comparison to casinos doesn't end there. Just as with casino operators, mobile game developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

16. Game Informer, another respected videogame magazine, reported on the rise (and danger) of micro-transactions in mobile games and concluded:

"[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[6]

17. Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing so-called free-to-play games of chance (called "casino" games below) and stated that:

"[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with

---

[3] PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 13, 2018).
[4] The Badger, *Are micro-transactions ruining video games? | The Badger*, http://web.archive.org/web/20141112093716/http://www.badgeronline.co.uk/micro-transactions-ruining-video-games/ (last visited Apr. 9, 2015).
[5] *Id.* (emphasis added).
[6] Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited Apr. 13, 2018)
COMPLAINT—CLASS ACTION
Case No.

- 4 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."

…

"According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

18.     The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

19.     The similarity between micro-transaction based games of chance and games of chance found in casinos has caused governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result,

---

[7]  Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

[8]  *Id.* (emphasis added).

[9]  In late August 2014, South Korea began regulating "social gambling" games, including games similar to Defendant's, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, https://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Apr. 9, 2018). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

COMPLAINT—CLASS ACTION
Case No.

- 5 -

Tousley Brain Stephens, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

and as described below, Defendant's online gambling games have thrived and thousands of consumers have spent millions of dollars unwittingly playing Defendant's unlawful games of chance.

## II. A Brief Introduction to Scientific Games

20. Scientific Games is a leader in the interactive gaming industry that has been in the casino and gambling business for over 70 years. In 2012, Scientific Games released a number of online casino games, including "one of the most successful social casino games in the world"—Jackpot Party Casino.

21. Consumers can play Defendant's online casino games by downloading one of its many mobile casino games on Apple iOS and Android devices, or by playing the online casino games on Facebook.

22. Defendant has made large profits through its online gambling games. According to its press release, Scientific Games generated over $823 million in the fourth quarter of 2017.[10] As explained further below, however, the revenue Defendant receives from the its online casino games are the result of operating unlawful games of chance camouflaged as innocuous videogames.

## III. Defendant's Online Casino Contains Unlawful Games of Chance

23. Consumers visiting Defendant's online casino for the first time are awarded free chips. These free sample chips offer a taste of gambling and are designed to encourage players to get hooked and buy more chips for real money.

24. During gameplay, Defendant displays various special offers to consumers via a pop-up screen in order to entice consumers to purchase additional chip at a discounted price. For example, Defendant's Jackpot Casino electronic store sells discounted chips ranging from $4.99 to $99.99. *See* Figure 1.

---

[10] *Scientific Games Reports Fourth Quarter and Full Year 2017 Results,* https://www.prnewswire.com/news-releases/scientific-games-reports-fourth-quarter-and-full-year-2017-results-300606074.html (last visited Apr. 17, 18).

COMPLAINT—CLASS ACTION
Case No.
- 6 -
TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992



(**Figure 1.**)

25. After they begin playing, consumers quickly lose their initial allotment of chips. Immediately thereafter, Defendant informs consumers via a pop-up to "PURCHASE a coin package above to keep spinning" concurrently with an offer to purchase chips with real money. Defendant's chips range in price from $4.99 for 20,000,000 chips to $24.99 for 166,000,000 chips. *See* Figure 2. Once players run out of their allotment of free chips, they cannot continue to play the game without buying more chips for real money

COMPLAINT—CLASS ACTION
Case No.

- 7 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

(**Figure 2.**)

26. The decision to sell chips by the thousands isn't an accident. Rather, Defendant attempts to lower the perceived cost of the chips (costing just a fraction of a penny per chip) while simultaneously maximizing the value of the award (awarding millions of chips in jackpots), further inducing consumers to bet on its games.

27. To begin wagering, players select the "TOTAL BET" that will be used for a spin, as illustrated in Figure 3, which shows one of Defendant's Jackpot Party slot machine games. Defendant allows players to increase or decrease the amount he or she can wager and ultimately win (or lose).



(**Figure 3.**)

28. Once a consumer spins the slot machine by pressing the "SPIN" button, no action on his or her part is required. Indeed, none of Defendant's online casino games allow (or call for) any additional user action. Instead, the consumer's computer or mobile device communicates with and sends information (such as the "TOTAL BET" amount) to Defendant's servers. Defendant's servers then execute the game's algorithms that determine the spin's outcome. Notably, none of Defendant's games depend on any amount of skill to determine their outcomes—all outcomes are based entirely on chance.

29. Consumers can continue playing with the chips that they won, or they can exit the game and return at a later time to play because Defendant maintains win and loss records and account balances for each consumer. Indeed, once Defendant's algorithms determine the outcome of a spin and Defendant displays the outcome to the consumer, Defendant adjusts the consumer's account balance. Defendant keeps records of each wager, outcome, win, and loss for every player.

COMPLAINT—CLASS ACTION
Case No.
- 8 -
TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

### FACTS SPECIFIC TO PLAINTIFF FIFE

30. In 2017, Plaintiff Sheryl Fife began playing Jackpot Party Casino through her Apple iOS device. After Plaintiff lost the balance of her initial allocation of free chips, she purchased chips from the Defendant's electronic store.

31. Thereafter, Fife continued playing various slot machines and other games of chance within Defendant's casino where she would wager chips for the chance of winning additional chips. Starting in, March 2018, Plaintiff Fife wagered and lost (and Defendant therefore won) $4.99 at Defendant's games of chance.

### CLASS ALLEGATIONS

32. **Class Definition**: Plaintiff Fife brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of herself and a Class of similarly situated individuals, defined as follows:

> All persons in the State of Washington who purchased and lost chips at Defendant's online casino games.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

33. **Numerosity**: On information and belief, tens of thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendant's records, discovery, and other third-party sources.

34. **Commonality and Predominance**: There are many questions of law and fact common to Plaintiff's and the Class's claims, and those questions predominate over any

COMPLAINT—CLASS ACTION
Case No.
- 9 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

      a.    Whether Defendant's online casino games are "gambling" as defined by RCW § 9.46.0237;

      b.    Whether Defendant is the proprietor for whose benefit the online casino games are played;

      c.    Whether Plaintiff and each member of the Class lost money or anything of value by gambling;

      d.    Whether Defendant violated the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.*; and

      e.    Whether Defendant has been unjustly enriched as a result of its conduct.

35. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff's and the members of the Class sustained damages arising out of Defendant's wrongful conduct.

36. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money playing Defendant's games of chance. Plaintiff also has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the Class.

37. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiff challenges

COMPLAINT—CLASS ACTION
Case No.
- 10 -

Tousley Brain Stephens, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

apply and affect members of the Class uniformly, and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same.

38. **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

39. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violations of Revised Code of Washington § 4.24.070**
**(On behalf of Plaintiff and the Class)**

40. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

41. Plaintiff, members of the Class, and Defendant are all "persons" as defined by RCW § 9.46.0289.

42. The state of Washington's "Recovery of money lost at gambling" statute, RCW 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or

COMPLAINT—CLASS ACTION
Case No.

- 11 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

43. "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

44. Defendant's "chips" sold for use in its online gambling games are "things of value" under RCW § 9.46.0285.

45. Defendant's online gambling games are illegal gambling games because they are online games at which players wager things of value (the chips) and by an element of chance (*e.g.*, by spinning an online slot machine), are able to obtain additional entertainment and extend gameplay (by winning additional chips).

46. Defendant Scientific Games is the proprietor for whose benefit the online gambling games are played because it owns the online gambling games and operates those games for its own profit.

47. As such, Plaintiff and the Class gambled when they purchased chips to wager at Defendant's online gambling games. Plaintiff and each member of the Class staked money, in the form of chips purchased with money, at Defendant's games of chance (*e.g.*, Defendant's slot machines) for the chance of winning additional things of value (*e.g.*, chips that extend gameplay without additional charge).

48. In addition, Defendant's online gambling games are not "pinball machine[s] or similar mechanical amusement device[s]" as contemplated by the statute because:

    a. the games are electronic rather than mechanical;

    b. the games confer replays but they are recorded and can be redeemed on separate occasions (*i.e.*, they are not "immediate and unrecorded"); and

    c. the games contain electronic mechanisms that vary the chance of winning free games or the number of free games which may be won (*e.g.*, the games allow for different wager amounts).

COMPLAINT—CLASS ACTION
Case No.

- 12 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

49. RCW § 9.46.0285 states that a "'Thing of value,' as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

50. The "chips" Plaintiff and the Class had the chance of winning in Defendant's online gambling games are "things of value" under Washington law because they are credits that involve the extension of entertainment and a privilege of playing a game without charge.

51. Defendant's online gambling games are "Contest[s] of chance," as defined by RCW § 9.46.0225, because they are "contest[s], game[s], gaming scheme[s], or gaming device[s] in which the outcome[s] depend[] in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." Defendant's online gambling games are programmed to have outcomes that are determined entirely upon chance and a contestant's skill does not affect the outcomes.

52. RCW § 9.46.0201 defines "Amusement games" as games where "The outcome depends in a material degree upon the skill of the contestant," amongst other requirements. Defendant's online gambling games are not "Amusement games" because their outcomes are dependent entirely upon chance and not upon the skill of the player and because the games are contests of chance, as defined by RCW § 9.46.0225.

53. As a direct and proximate result of Defendant's gambling game, Plaintiff Fife and each member of the Class have lost money wagering at Defendant's games of chance. Plaintiff Fife, on behalf of herself and the Class, seeks an order (1) requiring Defendant to cease the operation of its gambling games; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

**SECOND CAUSE OF ACTION**
**Violations of the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.***
**(On behalf of Plaintiff and the Class)**

54. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

COMPLAINT—CLASS ACTION
Case No.
- 13 -
TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

55. Washington's Consumer Protection Act, RCW § 19.86.010 *et seq.* ("CPA"), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

56. To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." RCW § 19.86.020.

57. The CPA states that "a claimant may establish that the act or practice is injurious to the public interest because it . . . Violates a statute that contains a specific legislative declaration of public interest impact."

58. Defendant violated RCW § 9.46.010, *et seq.* which declares that:

"The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.

It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace."

59. Defendant has violated RCW § 9.46.010, *et seq.*, because its Defendant's online games are illegal online gambling games as described in ¶¶ 40 to 53 *supra.*

60. Defendant's wrongful conduct occurred in the conduct of trade or commerce—*i.e.*, while Defendant was engaged in the operation of making computer games available to the public.

61. Defendant's acts and practices were and are injurious to the public interest because Defendant, in the course of its business, continuously advertised to and solicited the general public in Washington State and throughout the United States to play its unlawful online gambling games of chance. This was part of a pattern or generalized course of conduct on the

COMPLAINT—CLASS ACTION
Case No.
- 14 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

part of Defendant, and many consumers have been adversely affected by Defendant's conduct and the public is at risk.

62. Defendant has profited immensely from its operation of unlawful games of chance, amassing hundreds of millions of dollars from the losers of its games of chance.

63. As a result of Defendant's conduct, Plaintiff and the Class members were injured in their business or property—*i.e.*, economic injury—in that they lost money wagering on Defendant's unlawful games of chance.

64. Defendant's unfair or deceptive conduct proximately caused Plaintiff's and the Class members' injury because, but for the challenged conduct, Plaintiff and the Class members would not have lost money wagering at or on Defendant's games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

65. Plaintiff, on her own behalf and on behalf of the Class, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

66. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

67. Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant received from them for the purchase of chips to wager at Defendant's online gambling games.

68. Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

69. Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendant has unjustly obtained as a result of its unlawful operation of unlawful online gambling

COMPLAINT—CLASS ACTION
Case No. - 15 -

Tousley Brain Stephens, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

games. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

70. Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

Plaintiff Sheryl Fife, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

a) Certifying this case as a class action on behalf of the Class defined above, appointing Sheryl Fife as representative of the Class, and appointing her counsel as class counsel;

b) Declaring that Defendant's conduct, as set out above, violates the CPA;

c) Entering judgment against Defendant, in the amount of the losses suffered by Plaintiff and each member of the Class;

d) Enjoining Defendant from continuing the challenged conduct;

e) Awarding damages to Plaintiff and the Class members in an amount to be determined at trial, including trebling as appropriate;

f) Awarding restitution to Plaintiff and Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendant unjustly received;

g) Awarding reasonable attorney's fees and expenses;

h) Awarding pre- and post-judgment interest, to the extent allowable;

i) Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiff and the Class; and

j) Awarding such other and further relief as equity and justice require.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

COMPLAINT—CLASS ACTION
Case No.

- 16 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Dated: April 17, 2018

Respectfully Submitted,

TOUSLEY BRAIN STEPHENS, PLLC

By: */s/Janissa A. Strabuk*
By: */s/Cecily C. Shiel*
Janissa A. Strabuk, WSBA #21827
Cecily C. Shiel, WSBA #50061
jstrabuk@tousley.com
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600
Fax: 206.682.2992

Rafey Balabanian*
rbalabanian@edelson.com
Eve-Lynn Rapp*
erapp@edelson.com
Todd Logan*
tlogan@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Benjamin H. Richman*
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1400
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice* admission to be sought.

*Attorneys for Plaintiff and the Putative Class*

COMPLAINT—CLASS ACTION
Case No.

- 17 -

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992