# *Exhibit A*

Exhibit A

iPad containing Jackpot Party Casino app is being filed in physical form with the Clerk.

*Exhibit B*

Exhibit B

Thumb drive containing video of Jackpot Party Casino app is being filed in physical form with the Clerk.

140450793.1

# *Exhibit C*



‹ Search



# Slots: Jackpot Party Casino

Play Free Vegas Slot Games

 In-App
Purchases



4.5 ★★★★½     #5      12+
23.1K Ratings      Casino      Age





☐ Offers iPhone App ⌄

** Get 6,000,000 FREE BONUS COINS on first install! **
Spin slots and put Lady Luck to the test! Experience the thrill of real Vegas slot machines with Jackpot
Party Casino.                                                        more

**Phantom EFX**
Developer





**6,000,000**

# DAILY BONUS

SPIN!

4,000,000

900,000

160,000

600,000

720,000

100,000

1,400,000

1,000,000

2,000,000

1,100,000

800,000

780,000

4



7,404,000

# SETTINGS



**Lobby Music** 

**Slot Music** 

**Enter Promo Code** 

**About Us** 

**Help** 

**Player Name**
**Guest**

**PlayerID**
**122109444**

**Version**
**5001.04**

**Logout** 

6



7,404,000



Sale



1







Sign in with Facebook



BONUS
MAX COINS!
COLLECT



PLAY NOW!
ZEUS II



JACKPOT PARTY



BUY COINS!

7

Case 2:18-cv-00965-RSL   Document 31-1   Filed 07/02/18   Page 13 of 76







7,404,000

1

4 with a on reel 5 on a line
awards the Grand Progressive!








54,000
Bet

Win!



8





6,679,000















BONUS

MAX COINS!

COLLECT











6,879,000

Sale

2

# FREE COINS!

## 200,000

### Thank you!

Collect your FREE COINS!

**COLLECT**

Facebook

BONUS

00 : 59 : 50

COLLECT

PLAY NOW!

ZEUS II

JACKPOT PARTY

BUY COINS!

14

7,079,000



**JOIN THE PARTY SALE**

| | | | |
|---|---|---|---|
| ~~650,000,000~~ 1,300,000,000 | BEST VALUE | $99.99 USD | BUY! |
| ~~200,000,000~~ 400,000,000 | | $49.99 USD | BUY! |
| ~~83,000,000~~ 166,000,000 | MOST POPULAR | $24.99 USD | BUY! |
| ~~24,000,000~~ 48,000,000 | | $9.99 USD | BUY! |
| ~~10,000,000~~ 20,000,000 | | $4.99 USD | BUY! |

BONUS
00 : 59 : 37
COLLECT

15



7,079,000



Sale



2







Sign in with Facebook



BONUS

00 : 59 : 30

COLLECT







16



7,079,000



Sale



2






Sign in with Facebook

BONUS
00 : 59 : 24
COLLECT







17

*Exhibit D*



(/hc/en-us)



Jackpot Party Casino Help (/hc/en-us)  >  Facebook (/hc/en-us/categories/200282880-Facebook)  >  Features (/hc/en-us

# Daily Bonuses & Free Coins

Jackpot Party Casino provides players with free coins in many ways!

Once per day, you can spin your Daily Bonus Wheel to earn big rewards. This daily bonus awards you a large sum with the opportunity to win millions of free coins! The three factors of your Daily Bonus Wheel are the Daily Bonus, Return Bonus, and Friend Bonus that when added together complete your Total Bonus for the day. The Return Bonus is based on how many consecutive days you return to the game, with a maximum of 7 days. The Friend Bonus is based on how many of your Facebook friends that play our game. Be sure to play every day to win more free coins!

In addition to your Daily Bonus Wheel, we offer a smaller collection every 4 hours throughout the day. This Timed Bonus is located in the lower right portion of the main lobby with a visible countdown timer. Collecting these free coins throughout the day will boost your bankroll so you can keep spinning our authentic, free slot machines!

Keep an eye on our Facebook community page, where we offer even more free coins to collect so you can spin your favorite casino games for big wins! Make sure your notification settings are turned on so you never miss out on our daily bonuses and free coins!

*Free coins from our community page cannot be collected on mobile devices at this time

James Grant - Friday at 16:33

Was this article helpful?

👍 (/hc/en-us/signin?return_to=https%3A%2F%2Fjackpotpartycasino.zendesk.com%2Fhc%2Fen-us%2Farticles%2F360002535534-Daily-Bonuses-Free-C

👎 (/hc/en-us/signin?return_to=https%3A%2F%2Fjackpotpartycasino.zendesk.com%2Fhc%2Fen-us%2Farticles%2F360002535534-Daily-Bonuses-Free-C

10 out of 26 found this helpful



(https://www.facebook.com/JackpotPartyCasino) (https://twitter.com/JackpotParty) (https://www.instagram.com/jackpotpartycommunity/) (https://www.youtube.com/channel/UCw4WCXeA-

Powered by Zendesk (https://www.zendesk.com/help-center/?
utm_source=helpcenter&utm_medium=poweredbyzendesk&utm_campaign=text&utm_content=Williams%20Interactive,%20LLC.)

# *Exhibit E*



**Get the facts to know the way to go.**
Warning signs you may be playing on, or operating, an illegal Social Gaming website in Washington State:

- **There is no way to play for free.**

- **The prize can be sold or redeemed for "real" money.**

- **Players must:**
  - **Pay "real" money to play.**

  - **Give banking information to collect a prize.**

  - **Call to start play.**

  - **Disclose personal information, such as a credit card number, social security number, etc.**



**Washington State Gambling Commission**

**Who We Are**
- The Commission was created in 1973 to regulate and control authorized and illegal gambling activities (RCW 9.46).
- We are a law enforcement, regulatory and licensing agency.

**What We Do**
- We license and regulate all authorized gambling in the state, except for horse racing and the State Lottery.
- We investigate and control unauthorized and illegal gambling activities.

**Our Mission**
Protect the Public By Ensuring
That Gambling is Legal and Honest.

Learn more about us at <u>wsgc.wa.gov</u>

 <u>WAGambling</u>

*This brochure gives general guidance.*
You should contact an attorney if you have questions or are unsure whether a game has the *3 elements* of gambling.

You may also contact us at:
(360) 486-3463
(800) 345-2529, ext. 3463
FAX (360) 486-3631
E-mail: <u>AskUs@wsgc.wa.gov</u>
Mail: P.O. Box 42400, Olympia, WA 98504-2400

*Photos are ©iStockphoto by the following artists: Cover MerveKarahan / Laptop user gremlin, / blindfolded man DNY59, / @coin geopaul, / no cash value coin DNY59, / treasure chest bphillips.*

GC5-027 (3/14)

# Online Social Gaming

**When is it legal?**
**What to Consider**

## Let's play a game



### What is Social Gaming?

The Oxford dictionary defines **Social Gaming** as the activity or practice of playing an online game on a social media platform, with a major emphasis on friends and community involvement.

Social Gaming ranges from tending a farm to playing a soldier in combat. Ideas for new games are constantly thought up. Some popular social games involve:

- Role playing;
- Adventure;
- Arcade style games; and
- Casino style games.

Social Gaming is growing at an unprecedented rate and with it comes questions. This brochure gives general guidance to help you determine if you are playing on, or operating, a legal Social Gaming website in Washington State.

*"Real" money = Legal tender, U.S. Currency.*



### Is Social Gaming Legal in Washington?

Social Gaming is legal in Washington State if no gambling takes place.

### What is Gambling?

Gambling involves **3 elements:**

1. Prize;
2. Consideration (something of value, wager, fee to play); and
3. Chance.

**Legal**: If one of the **3 elements** of gambling is removed, the game is not gambling.
Things to keep in mind, to keep it legal:

- There must be a way to play for free.
- If "real" money can be used to enhance or extend play, there must be no prize.

**Illegal**: If a Social Game has the **3 elements** of gambling, it is illegal and cannot be played, or operated, in Washington State. It is illegal to solicit Washington residents to play illegal Social Games.

*Website's Rules of Play:*

- If you are thinking about participating in a Social Game, read the website's Rules or Terms of Use to determine if one of the **3 elements** of gambling is removed.
- Website operators should clearly state in their Rules that virtual money, points, and other items cannot be sold or redeemed for "real" money or prizes.

Washington State law defines gambling as:

"staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." (RCW 9.46.0237)

### No Prize = No Gambling = OK To Play

*Buying virtual money:*
Many Social Gaming websites give free virtual money to begin play, with an option to buy more virtual money with "real" money to continue play. All play uses this virtual money.



Legal Social Gaming websites will not let players cash in their virtual winnings or points for "real" money or prizes.


Because there is no prize, these games are **not** gambling. However, if the virtual money can be sold or redeemed for "real" money or a prize, the game is illegal.

*Buying virtual prizes, avatars & tools:*
If a player spends "real" money for a virtual prize, avatar or tool to assist with game play and these items cannot be sold or redeemed for "real" money or a prize, it's **not** gambling.

For example, let's say a player uses "real" money to purchase a key to open a chest containing a rare item that the player's character can use to advance their position in the game.

Even though "real" money is used to buy a key to get a rare item, neither the key or rare item have any real-world value because they cannot be sold or redeemed for "real" money. Because there is no prize, it's **not** gambling.

# *Exhibit F*

**WASHINGTON STATE**
**GAMBLING COMMISSION MEETING**
**THURSDAY, MAY 9, 2013**
**APPROVED MINUTES**

## - PUBLIC MEETING -

**Chair John Ellis** called the Gambling Commission meeting to order at 9:55 a.m. at the Vancouver Heathman Lodge and introduced the members present. He welcomed ex-officio member Senator Steve Conway, who represents the 29th District in Tacoma. Senator Conway has quite a background in gambling issues, in large part from him chairing for a number of years the primary House committee that heard gambling related legislation.

| | |
|---|---|
| **MEMBERS PRESENT:** | **Chair John Ellis,** Seattle |
| | **Commissioner Mike Amos**, Selah |
| | **Commissioner Kelsey Gray**, Seattle/Spokane |
| | **Commissioner Margarita Prentice**, Seattle |
| | **Senator Steve Conway,** Tacoma |
| | |
| **STAFF:** | **David Trujillo**, Interim Director |
| | **Mark Harris**, Assistant Director – Field Operations |
| | **Tina Griffin**, Assistant Director – Licensing Operations |
| | **Amy Hunter**, Administrator – Communications & Legal |
| | **Callie Castillo**, Assistant Attorney General |
| | **Gail Grate**, Executive Assistant |

**Agenda Review / Director's Report:**

**Interim Director David Trujillo** asked Chair Ellis to join him at the podium for a personnel recognition matter. He explained that Chair Ellis' term as Gambling Commissioner will end June 30 and he recognized Chair Ellis for his dedication to the Governor of Washington State, to this Commission, licensees, staff, and to the citizens of Washington State. Chair Ellis has served with distinction and honor. Interim Director Trujillo read a thank you letter from Governor Jay Inslee to Chair Ellis dated May 8 and presented a certificate and plaque commemorating his term of service on the Gambling Commission from February 2005 to June 2013.

**Chair Ellis** thanked his fellow Commissioners, the staff of the Gambling Commission, all of the stakeholders, representatives of the Tribes, and others who were present. He said it had been extremely rewarding to participate as a Commissioner on the Gambling Commission for eight plus years. It is frequently said, but cannot be said too often, that the Gambling Commission staff operate as a model public agency, and that is definitely true. It has been extremely enjoyable to be a part of and to observe their commitment to making gambling not only fair and honest, but well received, and dealing with issues openly in the state. He has enjoyed very much working with all of the stakeholders concerning gambling issues; although, some of the stakeholders may not regret

too much seeing him depart since he was not always on their side. But at the same time, Chair Ellis said he has enjoyed their professional approach to the issues that the Commission had to deal with – many of which were not easy.

## Agenda Review/Director's Report

**Chair Ellis** announced that the executive session at the end of the meeting was going to be significantly longer than normal because the Commission would be reviewing the qualifications of applicants for the Director position. As a departure from the normal procedure, after the conclusion of the executive session, the public meeting would be reopened to make a decision concerning the recruitment process, because that needs to be made in a public meeting.

**Interim Director Trujillo** welcomed Senator Conway to his first meeting as an ex-officio on the Commission, adding he looked forward to learning from Senator Conway's experience. He reported that the Governor had appointed Mr. Chris Stearns to the vacant Commissioner position. He was unable to make this meeting, but does plan to attend the July Commission meeting. Commissioner Stearns is from the Navajo Nation and practices Native American law with Hobbs, Straus, Dean & Walker. He is an active member of Seattle's Native American and social justice communities, has served as Chairman of the Seattle Human Rights Commission, and serves on the Seattle Public School Strategic Plan Task Force. In 2012, he was named Vice President of the Board of Directors of the Seattle Indian Health Board. Commissioner Stearns is no stranger to Washington, D.C. as he served as the Indian Affairs Director under Energy Secretary Bill Richardson, as Democratic Counsel to the U.S. House Committee on Natural Resources under Chairman George Miller, as Deputy Counsel to the U.S. House Native American Affairs Subcommittee, as North Dakota State Campaign Director for Vice President Al Gore, and as political advisor to Tex Hall who is the President of the National Congress of American Indians.

Interim Director Trujillo reported there were no staff requested changes to the agenda. He drew attention to a letter that explains the "My Account" online feature. Beginning on May 15, various online services will be available under the "My Account" tab. With one login, licensees would be able to submit activity reports, view previously submitted activity reports, update contact information, submit organizational employee applications with one electronic payment, get the contact name and number of their field agent, tell staff what information a licensee may want to receive, view calendar information of Commission events, view the latest newsletter and tweets, and complete a customer feedback form. Staff is continuing to work towards a one-stop, one portal for the "My Account" concept. Representative Richard DeBolt sent the Commission a letter dated April 10 that said his questions from November 2012 regarding a rule petition had been answered and he encouraged the Commission to act upon the petition. Representative DeBolt had sent the Commission a letter in November 2012 asking them to take pause with a rule petition and to consider it thoughtfully.

Interim Director Trujillo pointed out an article regarding the Washington State Online Poker Ballot Initiative, explaining there were currently two Initiatives (I-582 and I-583) that they are planning to move forward with. I-582 would authorize only online poker in this state; casino games and sports betting would still not be allowed. The proposal does have a mechanism for the Washington State Gambling Commission to create a licensing process for online poker rooms. Taxes would be

paid for online poker, but I-582 was silent as to what the tax rate would be.  I-583 would repeal the criminal penalties for online poker as long as the person was not involved in the operation of the gaming platform.

**Chair Ellis** asked if there were any questions; there were none.  He welcomed Paul Dasaro and Rick Herrington.

## **Staff Presentation on Social Gaming Platforms** *(PowerPoint Presentation)*

**Mr. Paul Dasaro,** Administrator of the Electronic Gambling Lab, introduced Rick Herrington, Program Manager in the Criminal Intelligence Unit, and explained they would be giving an overview about the concept of social gaming.  Social gaming is a very trendy issue right now and it is very difficult to define what it is; a lot of buzz about it is heard in the technology world.  There is no real industry-accepted definition of what exactly social gaming is, but generally speaking there are several characteristics that are typical of social games.  Some of those characteristics include online play over the internet.  Many of the games are characterized by the inclusion of multiple players.  Often players interact with each other at some level in an online world.  Many of the games use social media directly so people can log on to Facebook or some other social media site and play directly through their Facebook page.  The casino-style games in social gaming are characterized by the use of virtual game play credits that players can earn or they can purchase credits to play the game with real money, but the credits cannot be redeemed for real money.  The social gaming media makes most of its money from players that are offered the option of purchasing items within the game.

One of the popular games right now is called Farmville where players can pay a small amount of money to purchase additional land or an additional tool to use within the game.  It is important to note that most social gaming is not considered traditional casino style, although one of the most popular games is poker.  It is a very large and consistently growing industry with $8 billion in revenue last year.  At least 78 million people play these games in the United States and 200 million players worldwide play social games.  The question is what motivates people to play these games.  People spend hours playing the games.  Some of the items are community-based play – players playing either within a game world with other players nearby or playing directly against other players, which can be seen in the poker style games.  There is a lot of competition with people trying to beat each other and everybody is trying to improve their statistics, plus virtual cash is an element.  It is not necessary to buy virtual cash to play the game as most games offer players a certain amount of virtual cash just for entering.  Players do not have to actually purchase virtual cash with real cash, although that is an option.  The virtual cash does enhance game play and it also allows people to improve their play within the game.  Another popular social game is called Candy Crush.

One of the most popular poker games is a standard Texas Hold'em game called DoubleDown Casino.  Players are sitting at a virtual poker table playing with other real people who can be anywhere in the world.  They are playing with virtual chips that can either be purchased or just gained through entering the game.  This is a company that was purchased recently by IGT and is an IGT themed slot game.  DoubleDown is based out of Seattle.  It is an online version of the same game that has been approved for Washington TLS, and is in many jurisdictions throughout the

world.  Players are using virtual chips and not real chips, and these virtual chips cannot be redeemed for real cash.  With DoubleDown's ability to purchase virtual chips, players get 150,000 chips for $3, which they can purchase directly through their Facebook page.  Zynga has a different conversion, but is essentially the same concept.  Players can purchase more chips or more time to play with real money, which is how these companies make their money.  Most of the social games are played through any type of internet capable device, like desktop computers through web browsers or through specialized software that can be installed.  Mobile devices like Smartphones, Tablets, and iPods are a growing medium.  Apple devices are a closed environment, and are a relatively small share of Smartphones and Tablets, but they are very popular in certain parts of the world.  Android would be the more common types that are seen in Google and Samsung and are a more open environment, so it is a somewhat easier market for manufacturers to enter, and has a much larger market share throughout the world.

**Program Manager Rick Herrington** explained that when he looks at any form of gambling, especially on the internet, he applies the basic rules of gambling:  chance, consideration, or prize.  In each of these games, there are two of the elements, but not the third, which is an actual prize.  Players do get virtual prizes and/or an endorphin rush; they can build their avatar and improve their avatar by purchasing other things of the same nature.  It is not gambling in the current format according to Washington State law.  At any time in the future, if the federal government or Washington State changes its laws, any one of these social platforms could be changed to a real gambling platform overnight.

**Senator Steve Conway** asked if other states allowed prizes and how it would be monitored.  He asked if staff had checked other states to see if they were allowing actual prizes with this form of gaming.  **Mr. Herrington** replied he did not think anybody else was allowing prizes to be awarded.  He explained it was on Facebook and is being done internationally, but they are gambling platforms right now.  The only place they are not gambling formats is in the United States, but he could not say whether another state is allowing it.  If they are, they are in violation of the Unlawful Internet Gambling Enforcement Act (UIGEA) and a whole myriad of other laws.  UIGEA deals with internet gambling and payment services, so if there is any payment process done over the internet with any form of gambling, it is illegal.  If any state is offering this and allowing it to go on, it is in violation of federal law.

**Mr. Dasaro** stated there were several states that were in the process of allowing regular online gaming, but as far as he knew, most of those states were not contemplating using this particular type of gaming for their online sources.  A week or two ago Nevada went live with their first official intranet gambling platform, which is only within the boundaries of the state of Nevada, and that was done completely proprietary through a company called Fertitta Gaming.  Ultimate Poker is the name of the site, but that is a strict online gaming platform that is not tied to Facebook or any of the other traditional social gaming platforms.  Other states that are currently very close to developing similar platforms are Delaware and New Jersey.  There is talk within those states of establishing interstate gambling compacts so that an operator in Nevada could offer bets to players in New Jersey or Delaware, depending on how those compacts flesh out over time.  But under current law in all those states, it is just within the borders of that state.

**Chair Ellis** said if the issue for whether or not social gaming currently constitutes gambling under Washington law was prize, then what would players get if they won.  There is the option to buy chips, but does that mean the player simply has a bigger pile of chips in front of them than somebody who is playing solely with the free chips.  **Mr. Herrington** affirmed, if they are playing poker, they would have a bigger advantage over the player with fewer chips.  It is all virtual currency that does not really exist; it is just there and has no redeemable value.  **Chair Ellis** said that, to argue the other side of that question, as demonstrated by 78 million people playing the game in the United States there was a value in simply being able to play and to play effectively.  Therefore, if players were able to play more and play better by winning the virtual chips, they would have received a prize.  **Mr. Herrington** replied he would call it buying endorphins.

**Chair Ellis** asked if there were any more questions; there were none.  He thanked Mr. Dasaro and Mr. Herrington for the presentation.

## Recruitment Update

**Ms. Lisa Benavidez**, Administrator of the Human Resources and Training Division, gave an update on the process to date for filling the Director position.  At the April Commission meeting, the Commissioners approved the position description, a salary range of consideration, and a recruitment process in which Commission staff would be responsible for recruiting for the Executive Director position.  The job announcement was posted on April 15 and closed on May 5.  There were 27 applications received and of those 27 applications, 8 candidates met the minimum qualifications.  Of those 8 candidates, there was one application that was a really standout candidate.  Ms. Benavidez had been asked to provide a grouping of applicants:  the A group would be the candidates that would be recommended to move forward; the B group would be the candidates that met the minimum qualifications; and the C group would be the candidates that did not meet the qualifications required for this position.  During the Executive Session, the Commissioners will consider the candidates in both the A group and the B group.  Ms. Benavidez said she had a copy of the candidates placed in the C group in case the Commissioners were interested in looking at those.  Ms. Benavidez recommended moving forward during the executive session to review all of the candidates that meet the minimum qualifications, then come back to the public portion of the meeting and have the Commissioners make a decision on which of the eight candidates they would like to consider further.  The candidates are only identified by number in the packets of information provided to the Commissioners.  Once they decided which candidates to move forward, Ms. Benavidez would contact those candidates.  None of the candidates have been notified that this is a public process, so she would let them know that if they want to continue to be considered in this process, their names would be made public and the rest of the process would be happening in public.  She asked that the Commissioners let her know if they have recommendations or ideas on types of interview questions they would like to ask the top candidates.  Ms. Benavidez explained she would be responsible for writing the final interview questions and also for scheduling those interviews. She suggested a few dates that both she and AAG Callie Castillo was available.  She hoped that all the Commissioners would be available to interview the finalists and asked if the Commissioners had any conflicts on any of the following dates:  June 4, 10, 17, 18, 19, and 25.  Following the interviews, Ms. Benavidez would then move forward with scheduling the psychological and polygraph exams for the candidates.

**Chair Ellis** asked if, in the process as Ms. Benavidez envisioned it, following the interviews but before the polygraph and psychological exams, the Commissioners would have the option to designate a preferred candidate and proceed only as to that candidate.  **Ms. Benavidez** affirmed that was correct.

**Commissioner Gray** said she had glanced at the references and asked if they looked good.  She wanted to make sure the Commissioners were also involved in checking references and know what is said.  She thought it was really important the Commissioners developed questions that they have used.  **Ms. Benavidez** agreed.

**Chair Ellis** thought that was clearly an important part of Ms. Benavidez' proposal.  He suggested looking at several of the elements individually to make sure the Commissioners were all comfortable with them.  He said there was one candidate in the A group that Ms. Benavidez thought had outstanding credentials and seven in the B group who met the minimum qualifications but were not on the same level as the outstanding candidate.  These candidates have been identified by number only, not by name.  During the executive session, the Commissioners will review all eight of the applications to make sure they are comfortable with the decision that Ms. Benavidez had made; the one candidate in the A group and the seven in the B group.  He asked if that seemed like a good procedure; the other Commissioners affirmed.  He explained that at the end of the executive session, he would reconvene the public meeting for the Commissioners to make a determination as to which candidate or candidates they wanted to proceed with interviews.  He asked that AAG Callie Castillo attend both the executive session and the interviews to make sure the Commission does not cross the line between what can be discussed in an executive session versus what can only be discussed during an open public meeting.  He suggested going over the suggested interview dates.

**Commissioner Gray** agreed it was a good thing to look at the suggested interview dates, but thought the Commission had not had an opportunity to really look at the candidates.  She was concerned the Commission was moving too fast.  She understood they were trying to get this done quickly, but felt they had not had the opportunity to really look at the A group and the B group of candidates and decide whether the Commission was looking at interviewing just one candidate or more.  There may be two or three candidates from those eight.  She thought the Commission could look at the suggested dates, but she did not want to get locked into just those dates and that timing.  **Chair Ellis** responded he did not think the Commission was locked into anything; they would be looking at the candidates in the executive session later this afternoon.  If there was any follow-up the Commissioners thought was important, that they have not talked about, that could be done as well.  He explained that Ms. Benavidez was just trying to coordinate calendars, recognizing that June is entering into the vacation period.  There is no need for urgency because the Commission has a very good Interim Director; there is no huge hole that demands being filled immediately.  Chair Ellis asked if any of the Commissioners had a conflict with any of the suggested dates.  **Commissioner Amos** had a conflict on June 10.  **Chair Ellis** understood that plans could change and suggested that if any of those dates become ones where a Commissioner has a conflict, they should let him know and he would coordinate with Ms. Benavidez.  He indicated that Ms. Benavidez would continue to take the lead in the process of receiving the Commissioners' input on interview areas or questions they would like to see included between now and the week of May 13.  The Commissioners should give their input to Ms. Benavidez and she would prepare the questions.

It would be most efficient for all of the Commissioners who are available to attend the interviews, participate, and observe the candidates in action, and then be able to go into an executive session and discuss the qualifications of the candidates, taking into account their applications, their qualifications, and their interview performance.

**Commissioner Gray** asked about the group that had been selected at the April meeting that included Commissioner Amos, Ms. Benavidez, and herself.  **Chair Ellis** replied that, when they talked about that at the last meeting, it occurred to him that the other Commissioners would need to be present at the interviews in order to knowledgably discuss the candidates during the executive session.

**Commissioner Gray** said that, in the development of the questions, she was really interested in the kinds of questions they could have.  She was hoping that in executive session they could spend a bit of time on the kinds of questions.  **AAG Castillo** responded that any discussion would be prohibited under the Open Public Meeting Act.  Everything except the actual evaluation of the applicants must be done in a public setting; any general discussion by the Commission as a body, or any committee thereof (including two members), would have to be done in a public session. There would need to be notice to the public for any sort of meeting the Commission would have. The Open Public Meeting Act really limits what the Commission can do in executive session.  She suggested that if the Commission wanted to have a general discussion, they do it here in this meeting.  If a Commissioner has an individual thought, they could relay it directly to Ms. Benavidez, but if the Commission wants to have a discussion among themselves, it would have to be done in a public meeting.

For the same reason that AAG Castillo just mentioned, **Chair Ellis** cautioned against cc'ing the other Commissioners with any ideas a Commissioner may submit to Ms. Benavidez so there is not the appearance of a dialogue among the Commissioners to develop those questions.  Staff will give public notice of the Special Commission meeting for the purpose of the interviews, which only requires 24-hours notice.  **Commissioner Gray** asked if it was required to provide public notice that the Commission was going to have that discussion now.  **Chair Ellis** replied they could have that discussion now because it fit within the confines of the agenda item of the recruitment process. **AAG Castillo** confirmed.  **Commissioner Gray** asked if the Commissioners would be interested in giving Ms. Benavidez some general ideas on the kinds of questions they thought would be important.  **Ms. Benavidez** asked if Commissioner Gray would be concerned about doing that in front of any potential candidates that might be in the room.  **Commissioner Gray** replied no, it would just be general kinds of questions.  **Chair Ellis** pointed out that Mr. Trujillo, for example, was a candidate.  He thought Ms. Benavidez was asking whether Mr. Trujillo would have an advantage over other candidates the Commission may interview if he heard in advance the kinds of questions or areas of questioning the Commission was talking about.  He thought Mr. Trujillo could probably leave the room, but **AAG Castillo** replied that would not be required by law.  The Commission could not exclude candidates from the public meeting; it would be the candidate's own preference, but the Commission itself could not exclude the public, including applicants, from that discussion.  **Chair Ellis** asked if Commissioner Gray would like to suggest some areas that she would like to see included.  **Commissioner Gray** replied it was not so much in terms of areas, and she would not go into any detail, but she did believe a candidate's discussion about how they

might address a problem would be important. **Ms. Benavidez** suggested that Commissioner Gray send her an email if she would like to go into more detail. **Commissioner Gray** agreed.

**Chair Ellis** asked if any of the other Commissioners had areas or specific types of questions they thought should be included that they would like to discuss now. **Interim Director Trujillo** said he would prefer to step out of the room if there were any detailed questions. **Chair Ellis** asked if anyone had any detailed suggestions; there were none. **Chair Ellis** said the Commissioners would submit any input they had to Ms. Benavidez by the end of next week by email. **Ms. Benavidez** said she would be in the office all week so if anyone wanted to call her, she would be available. **Chair Ellis** asked if there were any other areas that Ms. Benavidez would like additional input from the Commission on. **Ms. Benavidez** replied there was not. **Chair Ellis** asked if any Commissioners had other comments or questions they would like to raise at this point.

**Commissioner Prentice** stated that over time, she has developed a trust for Ms. Benavidez and she did not think Ms. Benavidez needed a lot of additional instruction from the Commission. She thought they were all on the same page and did not want to get bogged down. She said it was time to proceed. **Chair Ellis** agreed, indicating that Ms. Benavidez and her staff had done a commendable job, being somewhat under the gun to proceed forward, in giving the Commission the draft job specifications, the draft bulletin, getting the bulletin published, and getting a broad response. **Commissioner Gray** agreed it was very thorough.

## Legislative Update

**Ms. Amy Hunter** provided a quick update on the legislative process, noting there would be a special session. The last day of the regular session was Sunday, April 28 and the special session is scheduled to begin on Monday, May 13. There are just a couple of bills that are still in the process:

- ESSB 5723 is the enhanced raffle bill that Special Olympics has addressed the Commission about in the past. That bill had some amendments that were done in the House so it needed to go back to the Senate for concurrence, which has occurred. The bill went to the Governor on April 27 and Ms. Hunter anticipated that he would sign the bill. Assuming that it is signed, it would be effective on July 28. Staff has tried very hard to cover the policy issues while it was in the process so that it would be the Legislature setting everything, like the "refer a friend" drawing and other special things. If it was not spelled out in the bill then it would come to the Commission during the rule making process to figure it out. Staff thought it was better to have things be specific. The main area that was not specific dealt with an independent audit, which Special Olympics wanted in the bill for their interest in protecting their assets. That is now in the bill and it is very specific that the Commission would do rule making around that. Ms. Hunter felt that would probably be the biggest area that would need more discussion. She did not want to downplay the amount of work that would be involved with the rule making, because staff will have to go through the current rules and see if they now conflict with what this law would allow and how to best spell that out. It might be one rule that says the provisions in x, y, z rules do not apply, or go through the individual rules and say something like except for enhanced raffles these are what the requirements are. Ms. Hunter has had e-mail conversations with Mr. Eliason, who is with Special Olympics, working on this to figure out who the people are from his

organization that will be their point of contact on the rule making part.  Plus staff from both Field Operations and Licensing Operations have been established.  Staff is anticipating the rules would be up for filing at the July meeting.  Ms. Hunter thought it was a disappointment to Special Olympics, who had some different ideas about the emergency rule making provisions and they were hoping to do a raffle by the end of the year.  Assuming the process goes smoothly, Ms. Hunter anticipated the rules would be up for filing at the July meeting, up for discussion at the August meeting, up for final action at the September meeting, and effective the middle of October.  The most work usually goes into rules when they are up for filing, so she thought Special Olympics would be able to make some fairly solid plans based on where the rule making process was at that point.  It is on the fast track already.  Typically, staff waits for the Governor's action before starting to do much more.  But in this case, with all of the outreach that had gone on, Ms. Hunter said she would be very surprised if the Governor would veto the bill.  If that happened, then staff would stop what they have done up to that point and go from there.

- House Bill 1403 deals with information that needs to be given to the Department of Revenue.  The bill passed unanimously in both the Senate and the House, but it had been changed at different times, so the bill had to go back for concurrence.  All of that happened, and the bill was delivered to the Governor who signed it on May 1.  It will be effective July 28.  Staff needs to let the Department of Revenue know who our coordinator is and get the applications over to the Department of Revenue.  It will take some time, but is not expected to be real intense.  The Commission has 38 business license applications that would be required under this bill to be provided to the Department of Revenue.  Assistant Director Tina Griffin has followed the bill very closely and already has some pretty defined ideas on how that would occur.

- SGA 9158 (Commissioner Prentice's confirmation) and SGA 9106 (Commissioner Gray's confirmation) are still active.  The Legislature has the ability to act on those during the special session, so there is still time.  The Commissioners continue to serve even if they have not gone completely through the confirmation process.

- The statewide budget bill is obviously the one that most of the action during special session should occur on.  And there is an update on page 4 of the memo explaining what the latest versions of those bills do as far as impacts on the Commission.  But really, they are impacts on agencies statewide.  There is nothing specific for the Gambling Commission in the budget, which is good news.

Those bills that died will be up for more discussion during the 2014 session.  They do not have to be reintroduced.  Some of the bills that died were gambling specific.

- House Bill 1295 modified the powers and duties of the Commission.

- HB 1824 reduced the penalty for a person when they're doing unlawful internet gambling in his or her primary residence, and it's for recreational purposes.  That bill did have a hearing.

- SB 5552 deals with child support enforcement and being able to check the DSHS system if there is a winner over a certain threshold.

Ms. Hunter said she would bring to the July Commission meeting a list of bills that would require any type of agency implementation. Staff tracks many other general government bills and near the end of the legislative session, the Legislative Team goes through those bills more closely to see if there are things that staff would need to do. Ms. Hunter started presenting that list last year and hoped that was an effective way for the Commission to know some of the behind-the-scenes things that happen at the end of the session. Ms. Hunter thanked the Commission for their assistance and input as she has gone through the legislative process. She said it was always helpful to hear their ideas and pass on their input on the bills to the Legislature.

**Chair Ellis** asked if there were any questions; there were none. He thanked Ms. Hunter for all of the good work done by her and her staff on another successful legislative session.

### House Bill 1295

**Chair Ellis** thanked Ms. Hunter for preparing the information; it was very helpful.

**Ms. Hunter** explained her memorandum included testimony on HB 1295, which several of the Commissioners had a chance to watch on TVW. This report was a follow-up to discussion at the last meeting about taking a position on HB 1295 at this meeting as opposed to waiting until the fall. Staff intends to meet with the members of the Committee during the interim, so the more they know about the Commission's position, the better they can pass that on to the committee members who are always genuinely interested in hearing what the Commission has to say. When Senator Conway was in the House, he always asked what the Commissioners thought. The bill deals with the Gambling Commission's powers and duties and gives some things to the Legislature that are currently in the Commission's powers and duties. The bill says the Legislature retains sole authority for approval of any *expansion* or *enhancement* of the scope and manner of approved gambling activities and any increase in the maximum wager, money, or other thing of value that may be wagered or contributed by a player in any gambling activity subject to that chapter. From a practical point, it means there would be some changes that are now accomplished by rule that would need to go to the Legislature. There would also be many current staff approvals that could fall under being an expansion or an enhancement. The question then becomes what the Legislature was intending and how the Commission would best deal with it.

The bill was introduced on January 22 and the prime sponsor was Representative Sam Hunt who had been the Chair of the House Government and Tribal Affairs Committee during the 2011 and 2012 sessions. That committee was responsible for hearing gambling-related bills. Prior to that committee, it had been the House Commerce and Labor Committee that had heard gambling bills for many years and was chaired by then Representative Steve Conway, who is now a Senator and an ex-officio member on the Commission. This year, gambling issues went to the Government Accountability and Oversight Committee, a newly created committee chaired by Representative Chris Hurst. There were seven other members who signed on to the bill: Representatives Rodne, Wilcox, Appleton, Zeiger, Moscoso, and McCoy. Some of those members had been on the House Government and Tribal Affairs Committee. Chair Hurst and Representative Moscoso would be the two members on the current committee who would be hearing this bill.

In January, previous Director Day and Ms. Hunter had met with Representative Hunt and Chair Hurst as a follow-up to the letter that Representative Hunt had sent to the Commission in November 2012 regarding the Galaxy Gaming petition. The timing ended up making it appear that the meeting was related to this bill, but was originally intended as a follow-up to the letter. During the meeting, the Representatives were very open to any options the Commission might see for the bill. Ms. Hunter followed up the meeting with an e-mail explaining the Commission had not had a chance to talk about the bill and that the comments had been offered from staff's perspective and to help ensure that, if legislation was passed, the Commission and staff would be properly interpreting it to carry out the intent of the bill. The Committee heard the bill on February 7 and the Commission decided at the February Commission meeting to take a neutral with concerns position on the bill. Ms. Hunter was able to relay that position to the Committee before they took executive action on the bill, which was scheduled but not voted on, so the bill died in Committee after the hearing. It was one of the few items on their agenda for that day and they devoted over 40 minutes of their one-hour hearing to the bill.

**Commissioner Prentice** said she had watched the hearing on television and thought they had a very good discussion. She did not have the feeling that it dragged on but felt it was done knowledgeably.

**Ms. Hunter** reported there were six people who testified about the bill:

- Representative Hunt did not have a lot of information about why he introduced the bill. He said that, as technology changed, he wanted to clarify that expansion of gambling was within the power of the Legislature, so his intent was to strengthen that. He also said he was willing to continue working on it and this was his first try to clarify that.

- Victor Mena said one of the themes of the hearing was the rules process, how that works, and how much time is devoted by the Commission. The piece that was missing from that testimony, which Ms. Hunter tried to make clear in her e-mail, was that much of that had to do with the laws that the Commission has to follow for rule making. By the time a petitioner files something, the Commission has to wait so many days before it is published in the register. It ends up being a minimum of a three-month process. That is not because anyone was being necessarily slow. He thought everyone could see the benefits of that three-month process as it allowed for more time.

- Ric Newgard is with Seattle Junior Hockey and the Washington Charitable and Civic Gaming Association. He said that right now they know who they need to come to for changes, which is the Gambling Commission. They have limited funds and do not have any funds to hire a lobbyist, so they would be concerned about not having access to the decision makers.

- Dolores Chiechi, Recreational Gaming Association, talked about the role that ex-officio members play, which gives the give-and-take, both for ex-officio members to give the Commissioners input and also to be able to take that back to the Legislature. She said that she was concerned and did not want to see it go backwards. The Gambling Commission was created to keep the Commission out of some of these areas.

- Chris Keeley, Recreational Gaming Association and the past owner of a card room for 14 years, spoke about some of the details the bill would have the Legislature involved in if it were to pass, like the game approvals.  The Committee would be dealing with derivatives of games and some things that this five-person Commission does not presently deal with because they are done by Commission staff.

Ms. Hunter said she spoke next and tried to be clear that the Commission had not had a chance to talk about the bill yet, but that she saw it as being a policy bill and the Commissioners appreciate that it is within the Legislature's purview to decide what type of direction they want to give.  The Commission would want to make sure that, if legislation passed, it was clear so they could carry out the intentions of the bill.  Ms. Hunter said she went through some of the different approvals that it appeared the bill would be hitting on, like wagering limits and rule changes that range from operational to licensing.  She went through how many petitions the Commission gets and how those were being disposed of.  If the Commission was not getting the petitions, then in theory the Legislature would be getting bills in those arenas.  She went through the list of other approvals that staff goes through.  One other thing that was discussed was the pilot program.  There was some discussion about whether that was a pilot program by the Legislature or by the Commission and that process.

- Martin Durkan, Jr., from the Muckleshoot Tribe signed up with a "maybe" position.  He went through what his testimony was.

Ms. Hunter said Chair Hurst explained that one of the reasons he signed on to the bill was so there would be a hearing on it.  They have seen many areas where major changes have occurred.  He thought the Tribes had major changes also and wondered whether the Legislature had a chance to catch its breath and ask where it was going.  He did reference back to the bad incident earlier that involved a couple of legislators, referring back to GamScam and everything that happened several years ago.  He said that he had seen this in other areas where the Legislature had ceded too much of its authority to agencies and he was interested in that across the board.  His question was whether the elected representatives of the people have enough oversight over what was going on.  He wanted to make it clear that he did not want those in the industry to think this was picking on any individual person, and that he shared this same concern about rule making and wanted to make sure that the Legislature was asking some questions.


The committee talked briefly about looking at some gambling issues during the interim and had a planning meeting that was scheduled near the end of session.  They ended up canceling that meeting.  Ms. Hunter assumed that had they had the meeting, they would have gone through the list of what items they wanted to look at during the interim.  She did not know if there would be that type of meeting during this special session, and she did not think there was any requirement that they have a work session and go over those.  Obviously, they can develop their list of items that they want to look at during the interim.  She was not certain if gambling would be on the horizon or not.  Ms. Hunter thanked the Commissioners for their input, adding she was glad they decided to have this discussion early as opposed to waiting until the fall because that would give more time to meet with members during the interim to take back any comments the Commission has and if their position of neutral with concerns has changed.

**Senator Prentice** said she was still neutral with concerns, except she was glad for the chance to see what it was that had been bothering the Legislature, and some of it was just bad memory.  She recalled being there – and particularly it was the pilot program -- and it was not really explained as applying to all applicants but was explained as a pilot program.  She thought "pilot program" meant a limited number.  She remembered thinking that she could have kicked herself because it was not defined or limited.  She said she always felt a little uncomfortable and she gathered that Chair Hurst was also feeling that way, then those kinds of uncomfortable feelings begin to increase.  And it looks like several legislators had questions that really did not get asked at the time.  Perhaps what is being seen is a chance to have a better discussion.  If the legislators are feeling uncomfortable with something, then they should say so and make it clear at the time.  Commissioner Prentice did not want to see overlooked what the Commission was created for.  It is going back in history, but maybe the Commission should take a look at how awful things were and why the government tried to take the politics out of it.  She did not want to lose the Commission's complete focus on that.  Some of the people that testified do not always agree with the Commission and do not always like the discussion.  The point is, the Commission takes it seriously and tries and knows all about it.  The legislators have to deal with so many things.  Commissioner Prentice said another thing she was afraid of – and people always have to be careful – was if you do not get it done early, a legislator can play a few games and say move to the ninth order of business and your bill does not get through.  The Commission does not do that here; they do not have that ability.  They know the games that can be played.  Commissioner Prentice said she would rather keep the Commission's and the Legislature's focus and have some good rancorous discussion because she believed everyone on the Commission and the Legislature was sincerely trying to do what was right within the state.  The Commission does not want to deliberately have anybody fail, but it has to deal with what the federal law said to do with Tribes.  It has tried to be fair.  This is going to continue.  She thought the kinds of discussions might be uncomfortable at the time, but also thought they were very healthy.  The Commission and staff need to make the Legislature feel more comfortable with what they do.  **Commissioner Gray** said she absolutely agreed.

**Senator Conway** made an observation that a ruling was made by Brad Owen that the enhanced raffle bill was considered an expansion of gaming in the Legislature.  Probably one of the most important public issues the Legislature has to consider is how certain changes lead to the expansion of gaming in this state.  He said he had left the House and moved to the Senate at the time and did not actually know how this bill came about because he was not involved in any of the development of it.  The bill has not been heard in the Senate; there has not been a Senate hearing on the bill.  He said that, if he understood anything about the background of this bill, the Legislative concern was that any action the Commission might take might lead to an expansion of gaming.  Senator Conway knew that prior to his leaving the House, the wager bill was one of those considerations of raising the wager limits without really taking into consideration how that might potentially expand gaming in general.  If there was any kind of concern he saw in this bill, it was trying to ensure that the actions of this Commission do not adversely impact the expansion of gaming because of the relationship between what the Commission authorizes and what would lead to an expansion of gaming in general.  That's what he saw in the bill.  He understood the complexities of the issue in terms of what was meant by enhancements.  That is the kind of phraseology that would be subject to a great deal of interpretation; what is an enhancement and what is the dividing line between what the Commission can do and what the Legislature has the authority to do.  In the testimony, clearly, the constitution set the authority of the Legislature in the

expansion of gaming, so that is the line that the Commission is trying to figure out here. Senator Conway said he had some background in this issue because the Legislature had some concerns about the issues of how some rule making that might occur on the Commission's level might actually expand gaming in general in the state.

**Commissioner Prentice** said she thought part of what was being seen was that the Chairs of the Committee had been different and that was what was being reflected in the different interest levels. Representative Chris Hurst is completely sincere and very smart, and he wants to look at the concerns a little deeper than they have been, which is fine. But it might look uncomfortable because he has a different focus, but she thought they could all live together.

**Chair Ellis** agreed, adding that Ms. Hunter had made the point at the last meeting that, to the extent there were comments being made by legislators, it might be time to look at these issues and study the gambling issues that reflect the change in the committee structure and the change in the committee personnel – the Representatives in the House that are now looking at gambling issues who were not there previously. Following up on the point that Senator Conway made, he noted it was not that long ago that then Representative Conway and Senator Kohl-Welles had a joint committee review of gambling issues. He did not think that any members of the House Oversight Committee were even aware that the study had gone on and he could imagine why it was difficult for the members to know that, particularly if there was also staff turnover in the interim. An important part of the process that needs to be had in connection with this bill, assuming that it continues to be on the table in the next session, is to educate the legislators about that kind of past history, as well as the past history that Commissioner Prentice and Senator Conway mentioned. The issue now before the Commission, recognizing that the Commission has taken a neutral with concerns position in the past, is whether they should take a position actively opposing the bill to make the Commission's view clear. Since the Commission was considering taking a position on this legislation, he thought the public should have the opportunity to address the issue, and opened the meeting to public comment.

**Ms. Dolores Chiechi,** Recreational Gaming Association (RGA), welcomed Senator Conway. She said the RGA knew how much knowledge and history Senator Conway brought to this issue, and they were encouraged by that. Ms. Chiechi said her mind was a little jumbled as to how she wanted to begin because when this bill was introduced, the industry felt it was quite a hit at them. In fact, when she met with a number of the sponsors of the bill, one of them said "Yes, Dolores, this is a target on your forehead." So when a legislator says something like that to her, she takes it seriously and does what she can to protect her members and see its defeat. She would like to see a thorough discussion and the Commission's awareness of some of those political things that occur when talking about the Legislature and the process that takes place there versus at the Commission meetings, which is much more apolitical, much more thoughtful, and a lot of time goes into it. There were many mis-statements that happened during that hearing. Ms. Chiechi said it was hard to sit in that audience and not have someone knowledgeable, like Ms. Hunter, on staff who could refute and explain to the Chair that, in fact, the Legislature did not create a pilot program; that was the Commission. The Legislature authorized house-banked card games, but the Commission made the decision to go into a pilot program. Ms. Chiechi said she did her best with all due respect to argue that point with the Committee Chair. House-banked card rooms have been in existence for 16 years and there has been all that time for the Legislature to pull back. As Commissioner

Prentice and Senator Conway know, there have been numerous bills year after year to put the card room industry out of business, to tax them out of business, and to restrict what they could do. So, they have been fighting for their existence, but they are now down to 55 clubs.

Ms. Chiechi said that when she inferred it would be difficult for the card room industry to get a hearing in front of the Legislature, the Chairman replied that "Well, there was an individual who called, asked for a hearing, got a bill drafted, and we passed it out of committee. It's as easy as that." Ms. Chiechi responded that for the past ten-plus years she has been working for this industry, and they have not been able to get a hearing on bills they want. That is the difference between this body of Commissioners and that legislative body. The RGA has presented petitions to this body and gotten some wins and some losses, but at least they get to have the dialogue, the conversation, with the Commission. She said she appreciated Commissioner Prentice's comment. It is sometimes raucous, and sometimes the industry vehemently disagrees, but it has always been done with respect and they have the opportunity to come to the podium and make their arguments. That is not the case when they cannot get a hearing on a bill that could save their industry. She wanted the Commission to understand that it was a lot different when they were talking about trying to educate 146 people in Olympia, not to mention committee staff that has changed more than three times, when committee staff does not have the knowledge to refute something the Chair says or something an individual testifies to. There were comments made that if the Tribes wanted an increase, it had to go before the Legislature – but it does not, and the committee was not corrected. The legislative staff did not correct them because maybe they were not aware. So that committee walks out thinking the bill affects everybody and that it was something that could potentially rein in the industry as a whole, but it would not. It would rein in 12 percent of the industry, but 88 percent would not be touched by this legislation. Ms. Chiechi had a hard time when those misstatements were made and she was sitting in the audience, with her tongue bleeding down her face, wanting to say "wait, that is not factual."

Some of the staff of this Commission has been doing this for decades and they understand the nuances of the industry, the licensees, and the politics of it. This Commission has been very conservative in addressing petitions that have come forward based on that, limiting the scope and nature through strict regulation and control. That is constantly part of the rules procedure and it is constantly part of the Commission's consideration as they look at petitions that are brought before them. It is really tough when the industry is outmanned, outgunned, and outspent in the Legislature. In this body, they do not have that influence because the Commission listens to the facts, the people, and the staff. Ms. Chiechi wished and hoped that the Commission would change its position and take a staunch opposition to this bill and really explain to the Legislature why it is important that these issues remain under the Commission's purview.

**Commissioner Amos** commented that it had been a real learning curve for him over the past five years since he was appointed. Before he got this appointment on the Commission, he was an officer with the Yakima Police Department and was the State President of WACOPS. When dealing with the legislature, they were able to go to Senator Conway's office and talk about legislation to help law enforcement, and also to talk with Senator Prentice. He said he felt the same way as Ms. Chiechi about House Bill 1295. He does not particularly care for the bill and thought the Commission needed to take a stance. The Commission should decide what it wants, and then it has to go back to the Legislature for them to vote on it. He did not think that was the

intent when it was set up all those years ago – back in the 70s when it first started because of the corruption in the gambling in this state. Commissioner Amos firmly believed the Commission needed to take concerns over this bill. He thanked Ms. Chiechi for her testimony. He said he wished he knew the hearing was going on because he would have liked to be there. Representative Chris Hurst and he have been cops together for years, which might give him a chance to discuss the bill.

**Ms. Chiechi** thanked Commissioner Amos, and asked what the purpose of this Commission would be if this type of legislation occurred; what the duty and the scope of this Commission would be. It would have to trim down. There would still be administrative hearings, but there would not be much point to have a meeting each month for about an hour. She thought a lot of those things should be relayed to the Committee by the staff. The statute that created the Gambling Commission outlined its duties. This Commission has been asked by the Legislature to come to them with recommendations, to come to them with the knowledge of sitting on this Commission for six years or the staff for decades, and to bring that knowledge forward to the Legislature who deals with thousands of issues every year for three months, 105 days or 60 days, and then they are bombarded with their personal jobs back in their district. They do not have time to delve into the issue as the Commission does. Ms. Chiechi thought this was an opportunity for the Commission to take a look at what the statute reads for its role and take more of a proactive position with the Legislature and show them that the Commission knows what it is doing, that the staff is educated and aware and knowledgeable on this issue.

**Commissioner Prentice** said she was not as inclined to punch the legislators back, but agreed they really did need more factual information. Chair Hurst talked about the industry continuing to expand, but the Commission knew that was not true. They get the list of all of those businesses that are no longer in existence, plus a couple more that are going to be gone soon. The Commission has tried to look at why. Some are because the economy is bad, but she wondered what else was going on. It is a big concern to everybody in this room, yet the assumption is it keeps growing. Commissioner Prentice thought the Legislature needed to take a look at that list, look at the changes, and look at what has happened with bingo, which is down to about 16 places now in the whole state. Each time it is less. The Commission is watching this huge change and is not just expanding everything. It is not so. But she wanted to be polite and show the Legislature a comparison of last year's list and this year's list so they can see what has actually happened. Commissioner Prentice said she was not ready, at this point, to hit back because the facts are wrong.

**Ms. Chiechi** replied that part of her challenge is that she could not even get a meeting with some of the legislators.

**Chair Ellis** commented that he was struck by the extensive number of comments about how slow the process is before the Gambling Commission and the alleged need for a faster process. As Ms. Hunter pointed out about the speed – it has to do with the Administrative Procedure Act and the various elements of that Act that have to be done at different times in order to allow public participation before a decision can be made by an administrative agency. It is ironic that when looking at the history of the petitions before this Commission, many of them have come from the RGA. And to the extent that there are victims of this slow process, it is the RGA and its members

that have been the victims, yet Ms. Chiechi was not complaining about the slowness of the process. **Ms. Chiechi** thanked Chair Ellis.

**Commissioner Gray** commented that as she was listening to Senator Conway, she recalled a conversation she had that she felt was really important.  The Legislature makes policy; that is the role of the Legislature to make policy.  The role of the Commission is to ensure that policy is followed.  When she read the bill, she said that was administrative; it is taking one piece and giving that to the Legislature to deal with without really looking at the policy.  She hoped that if this came back again, that in the interim some time would be spent on what the policy is that they are really looking at, and then they can begin to look at the role.  She thought this bill does not do what was intended by the Legislature.

**Commissioner Prentice** added that the Commission is designed to be regulatory and law enforcement and she did not know if anyone in the Legislature knew that.  There are assumptions about what the Commission is doing – like they were just giving the whole thing away – but she thought there was a whole lot of education that needed to be done politely.  The Commission needs to be very clear about what they are about.

**Senator Conway** said that when he was Chairman of the House Commerce and Labor Committee he was a firm believer in having a greater relationship between the Gambling Commission and the legislative bodies, which they did work on a little bit.  He shared an incident that does not deal with the Gambling Commission, but with the Lottery Commission.  The Lottery Commissioners made a decision to allow machines to be put up in the grocery stores and people to be able to go directly to those stores and purchase tickets.  That decision by the Lottery Commission directly impacted the gaming and how gaming is done in this state, in terms of putting money into machines.  That is the issue where this line is so important.  The decisions made at a Commission level may have impacts on how gaming is done and how it is authorized in the state.  Many who have a long history with gaming in this state know how things have changed.  Even legislators often pass bills without knowledge of how they are going to impact the general nature of gambling in this state.  Senator Conway said he knew that history very well, but was not going to revisit it. He thought the Legislature was trying to ensure that everyone clearly understood how their decision-making can impact gambling in general.  That case of the Lottery Commission is a good example of how they were just trying to help the sellers of their tickets do it easier and not have to have the sales going on directly with a clerk.  But when they allowed that machine to disburse tickets with money going in, it impacted how gaming and gambling was done in this state.  He said he just wanted to bring caution to that.  Although he has had no involvement on this bill, he believed that was what the Legislature was looking at.  Maybe this bill does not reflect exactly the language that is needed, but he thought that was the issue:  how Commission decisions impact gambling in general or the expansion of gambling in general in this state.

**Chair Ellis** agreed that was an important point.  There are times when it can be difficult for the members of the Commission to clearly focus on whether they are over the line in getting into developing policy in the gambling area versus enforcing what the Legislature has already decided. He thought it would be extremely valuable to the Commission going down the road that Senator Prentice is now a regular Commission member.  She has on a number of occasions pointed out to the Commission that they were on that line or over it and that it was something the Legislature

should deal with.  He said it would also be excellent to have Senator Conway present to the extent he was not tied up in the Legislature and was able to participate in that kind of dialogue.  He asked if there were any other comments; there were none.

**Commissioner Amos** said he was not happy with "concerns" and asked if there was a definition from an attorney that was a little stronger that would get the point across.  **Chair Ellis** asked if he meant other than oppose.  **Commissioner Amos** replied he thought the Commission should oppose the bill.  **Ms. Hunter** responded there were no actual definitions.  The sign-up in the House and the Senate are different and people sign up under many different ways.  When she signed up to talk on this bill, she put "other" because that was the closest box to neutral with concerns, and then she just explained it.  Ms. Hunter did not think there was a problem with the Commission just being flat out opposed to the bill, which sends a different message than neutral with concerns.  She thought the Commission was in the right place in February, but as the bill moved forward and as staff pondered enhancements and expansion, she started thinking maybe she should have recommended opposed at that point.  But staff is just dealing with the best information they have at the time.  All of these comments are very helpful and will help direct staff's comments, regardless of whether the Commission decides to remain neutral with concerns or opposed.  Just hearing the discussion has already given Ms. Hunter many ideas of other things that can be shared with the individual members during the interim

**Commissioner Amos** made a motion seconded by **Commissioner Gray** to oppose House Bill 1295.  *The vote was taken; the motion passed with four aye votes.*

**Chair Ellis** called for a break at 11:40 a.m. and reconvened the meeting at 11:55 a.m.

## Problem Gambling Program Updates

**Interim Director Trujillo** reported that the Commission was fortunate to have two presentations on problem gambling.  He explained that he and Lena Hammons from the Tulalip Tribes had known each other for a very long time; when he was a regulator from the State and she was a regulator from the Tribe.  He introduced Ms. Lena Hammons from the Tulalip Tribes.  **Chair Ellis** welcomed Ms. Hammons.

### *Tulalip Tribes* *(PowerPoint Presentation)*

Lena Hammons, Tribal Gaming Commission/Family Services Manager
Ellie Lorenz, Family and Youth Serviced

**Ms. Hammons,** Tulalip Tribal member and Executive Director of Behavioral Health that includes their problem gambling program, thanked the Commission for the honor of being here today to present her program in front of the Commission and the audience.  Ms. Hammons said she has an extensive history with the problem gambling program with the State, the Tribes, and the RGA program.  When she accepted this job, she had no clue that she would be in charge of the problem gambling recovery process, but was grateful to be back in this arena again.  She introduced Diane Henry, who is the Clinical Supervisor in the Chemical Dependency Program and is also the Supervisor of their Problem Gambling Program.  Ellie Lorenz has been in their problem gambling coalition over the past few years along with Ms. Hammons before she became Behavioral Health.

Ms. Lorenz is very knowledgeable and works very hard on the program.  In addition to being the lead problem gambling counselor, Ms. Lorenz is also a chemical dependency counselor.  Ms. Ellie Lorenz will be giving the presentation.

**Chair Ellis** welcomed Ms. Lorenz.

**Ms. Ellie Lorenz** introduced Diane Henry who would be showing the PowerPoint, adding that she did a wonderful job in designing the presentation.  Ms. Lorenz reported that she came to work for the Tulalip Tribes in 2008.  She is a Blackfeet from Montana, so she is the other Native.  That was one of the good things about being able to come to work for Tulalip, which has been such a rewarding experience.  Gayle Jones was their Clinical Director at that time.  Ms. Lorenz said a lot of people were interested in the history of how they started their own Problem Gambling Program among the Tribes.  Tulalip started the program in 1999.  They wanted to have the counselors become certified, but had not yet developed the ongoing state program.  Ms. Lorenz came on as a Chemical Dependency Counselor in 2008.  In 2009, she was going to Doctor Maurer, who was their supervisor consultant in Seattle for the gambling program.  At that time, the Tulalip had three counselors that were interested in becoming problem gambling counselors; herself, Gayle Jones, and Gary Isham.  They went to training and heard about the Compact funds.  Gayle Jones had the initiative to find out how the Tulalip could start its own program, which was the beginning.  She wanted Ms. Lorenz to apply for the coordinator position, which is what they needed, so she began.  Ms. Lorenz was under supervision, so she went to one of her monthly supervision trainings with Doctor Maurer and told him that she had been hired as the coordinator and asked what she should do.  There was no manual, so Doctor Maurer suggested Ms. Lorenz meet with Maureen Greeley from the Evergreen Council on Problem Gambling and a couple other people that could be her mentors, which was absolutely incredible.  From there, she had her first meeting with Ms. Greeley and Ricki Haugen from Kalispel who had started her program and had done the state certified program at the Kalispel Tribe in Spokane.  They were great mentors.  Ms. Lorenz went to the Advisory Committee on a quarterly basis, which was a great benefit because at that particular time new WAC rules and changes for gambling were coming in.  It helped her know what was going on so she was not completely in the dark anymore.  When it was time for Ms. Lorenz to get state certified, she had an idea of what to do and how to do it.  Between the Advisory Committee, Ms. Greeley, and supervision with Doctor Maurer, was the ground breaking area to get this program off the ground.  They are really proud to be the first state certified Problem Gambling Tribal Gaming Program in Washington State.  They started outreaching into their community and did all the different things they could do to get that going, but they also reached out to everybody and offered all of their services.  The Tulalip has a lot of its own cultural involvement, like the medicine wheel that brings mental, emotional, physical, and spiritual aspects to work with all of their clients.  Ms. Lorenz believed there were root problems that create problem gambling, and that finding out what the roots are and being able to pull them out is very helpful.  She tells her people that they are trying to eradicate all of the roots so they do not start springing up again and redeveloping.  They want to get rid of them for good, which the medicine wheel gives them the ability to do.  The program also has clinical assessment, with individual sessions and group counseling.  Gary Isham is their group leader and deals with education.  He gets down and really talks about what are pathological problem gamblers.  They are also getting a recovery home off the ground to be able to reach out to people that are coming from inpatient treatment so they will have a place to go with support and ways and means to continue their freedom from the addiction.  Their program has the

resources to continue the treatment without time limitations and can continue to work with people until they feel like their needs are met; they do not have a 28-session time constraint.  If they have to go further, they can.  They have the benefit of being able to work with them and for them for as long as it takes.

In the program's group sessions, Mr. Isham talks about finances, which is the number one thing with problem gamblers that they have to get a handle on immediately.  A lot of people do not like to talk about finances, but that is what they need to reach out and touch immediately.  They have to get that aspect open, shine the light on the secret and expose it, and then eradicate the root.  There is a lot of grief and loss that is very heavy.  People are carrying all of this within and do not even realize that it is one of the roots.  A lot of times when grief or loss is mentioned, people automatically think of death, but it really is so much deeper than that.  If they miss a telephone call, they can go into a grieving episode.  Giving up the addiction is a grief, giving up gambling, giving up whatever their addiction is.  So they spend a lot of time working on that, working on themselves, getting down and looking at what is really causing the problems.  Gary Isham does a lot with values and ethics, anxiety, depression, and then Post Acute Withdrawal Syndrome (PAWS), which starts anywhere from two months and can go on for a couple of years.  But PAWS is also a big part of recovery.  There is addiction versus wellbriety, which is like sobriety.  It is a matter of just getting well and going on from there; intellect over emotions.  Mr. Isham says let's talk about their intellect; let's not go to their emotions; let's try to stay out of emotions because emotions get them into trouble.  Emotion is action, so they are either going in a negative direction or a positive direction.  So if they are using intellect, then hopefully they can go down the straight road.  The program has inpatient treatment and can refer people if they meet the ASAM criteria and they really need inpatient treatment.  Ms. Lorenz works together with Evergreen Council for referrals.  There is a referral source in Louisiana and one in Oregon.  There are different places where people can be sent if they really need inpatient treatment.  The program also has culturally relevant programs:  Sweat, Talking Circle, AWARE, and family sessions.  AWARE is a very strong support system for people to be able to be around others who can support their emotions and their needs, and someone to listen to them and be there for them.  Through the program, there are a lot of events to know that there are other ways to have fun besides buying into their addictions, like lots of dances, community get-togethers, and that type of thing.  It is still new and is just taking off and doing well.

Currently there are more women than men in their program (about 11 men and 14 women).  These are actually quite high numbers for people in gambling treatment because their Tribe does not have them knocking down the walls or kicking down the doors wanting to come in.  That is because gambling is still where alcohol was about 30 or 40 years ago.  It is still the elephant in the room and is something that nobody wants to talk about, nobody wants to look at, and nobody wants to identify with it – if someone knows someone who has a problem, they just deny it and try to overlook it.  So it has taken time to get their numbers up, but they are up now.  In 1999, when Diane Henry started the program, they had one client.  All the counselors were fighting over that one client because they needed the hours to get certified, but that one client did not provide that many hours.  Their people are from all around Snohomish County, so it is a lot of work to get their Tribal members in the program.  Currently, they have a lot more non-tribal members.  There are a few tribal members, but it is lower now than it has been in the past.  There is no fee for the services and it is open to everybody, which they are very grateful for.

The number of gambling clients has increased through community awareness events. Ms. Lorenz sponsored the program with Evergreen Council on Problem Gambling because in the beginning, Maureen Greeley had opened doors for her and showed her where to go, what to do, and how to learn all the various things, which was wonderful because she had things she wanted to do. They started Four Directions Conferences, which bring the Nations together in gambling conferences to see what they have available and what problem gambling is all about. It is especially good for the Tribes that have casinos. To date they have had four of those conferences. The first one was at Muckleshoot, the next two were at Tulalip, and the last one was at Swinomish. Evergreen Council does a wonderful job of bringing this all together, and Ms. Lorenz has been pleased to be able to be a part of it. Two summers ago they offered the New Directions Summer Youth Program. Evergreen Council hired a lot of artists throughout the community to come and teach the Tulalip youth about cultural, and also provided gambling information, education on gambling, and education on different addictions. The youth also did a mural (a painting on a rock, a big beautiful one) and they were so proud of it because it was something they could look at and know they did it and were a part of.

The first couple of years, Ms. Lorenz tried to get into every community event that was imaginable. If it showed up, she was on the Richter scale and had all her stuff out there. She wanted everyone to see her, to know her, and to know that the Tribes had a problem gambling program. Even today, a lot of people do not know they have a problem gambling program, but she said she has not given up on that and is still working on it. Plans are to present at the National Conference where the Tulalip, Puyallup, and Swinomish are going to be presenters. There will be a breakout session and a hostess room to bring a lot of the Natives together and do a lot of networking, which Ms. Lorenz was excited about. It has been difficult getting the word out, letting people know who the members of the program are, and where they are located. They have benefited from the ads from Evergreen Council. The numbers are starting to go up thanks to the calls on the hotline, which has been very helpful. A meeting was started for providers, which includes five tribes that meet once a month to collaborate on what they know and to give information on what the program is doing. They bring information about what they are doing and share ideas and programs, and they have all grown from it. The Swinomish, Suquamish, Lummi, Puyallup, and Tulalip are part of the providers so far and those five Tribes have really benefited. No one showed up with a manual, so they are helping each other. The program has five staff members that include the Clinical Administrator Diane Henry and also Lena Hammons. She asked if there were any questions.

**Chair Ellis** asked if there were any questions of Ms. Lorenz; there were none. He thanked Ms. Hammons and Ms. Lorenz for the presentation, which was very informative on an extremely important topic. **Ms. Lorenz** thanked the Commission for their attention.

### *Puyallup Tribe of Indians* (PowerPoint Presentation)

**Interim Director Trujillo** introduced Jennifer LaPointe, the Operations Director of the Puyallup Tribal Health Authority, who has been with the Puyallup Tribe for 11 years and has direct oversight of the Problem Gambling Program development.

**Chair Ellis** welcomed Ms. LaPointe.

**Ms. Jennifer LaPointe,** Program Manager for Health Authority, thanked the Commission for their time to hear about the Puyallup Tribe's program. She mentioned that the Honorable David Bean had planned to be at this meeting but was ill and could not attend. She reported their Tribe has a Problem Gambling Prevention Treatment Program. She would be reviewing some of the highlights in a nutshell and some of the things that are most exciting that have been done since they started going down this road of problem gambling. The Tribe has been working on a multi-level program and goes off in a lot of avenues. She said she would go over some of the different things they have done within the Health Authority, the Emerald Queen Casino, and the Tribal Gaming collaboration with their communication plan, education, treatment, and then a little bit about their vision of where they want to go next.

The Health Clinic, the General Manager of the Emerald Queen Casino operations, and the Puyallup Tribal Gaming Agency are all working together. They all are very busy entities, so it has been difficult to make time for them to collaborate. They have worked together on many things, the biggest being self-barring policies and making sure the people who are asking to be self-barred from the casino know about the program and get the right resources. The casino customer population is much bigger than any population the Health Authority can serve, but a portion of them are eligible for the services. The Tribe wants to make sure those customers know about the program and have input from the program on what should be the parameters and requirements for people re-entering the program. They have had a lot of policy-type discussions and making sure that all the dots get connected and everyone knows what each other is doing in those areas. They have had discussions and will continue to have discussions on casino employees and problem gambling within the employee population: how to serve them and how to do prevention activities with casino employees. There is a lot of problem gambling with casino employees that cannot really be avoided because they work in a casino. They work together on that and make sure the HR Department has the resources and that they continue to talk about that. It is not ever going to resolve itself, so they have to try to work together to make sure their communication line is open and active, which is a good step. A lot of time and energy has been spent on communication outreach, branding, or marketing. There are a lot of education pieces in the community like Public Service Announcements (PSA) on problem gambling, responsible gaming, and all of those different pieces, but they do not speak directly to their community, which is really important to them. They need things that speak directly to their community, that the community recognizes them as their own, and that they are associated with them, their clinic, and what they have to offer. One of the first things they wanted to work on was reaching their people.

It was a large process. They created their own poster series, have their own PSAs that are played on closed-circuit TV in their clinic and in other parts of the Tribe, and did a community assessment to see what the problems were and what kind of messages would reach them. They conducted interviews with staff of the Tribe, the Council, and with walk-in patients to the clinic. Then they moved into developing some of those. They traveled around and worked with a lot of other places that have campaigns going on in different communities and casinos. They worked with Harrahs on their responsible gaming campaigns and met with some of their staff that developed it and who keep it ongoing. They went to other Tribal casinos throughout the United States that are doing responsible gaming campaigns and talked to them about what has been successful and not successful in their communities. That information was used to develop their own posters and

PSAs.  Once those poster series and PSAs were developed, they did a lot of market testing and put the posters out there and asked if they really reached people, if they looked like it reached their families, if it was specific to their community, and if it would impact people.  After they got that information back, it helped the program narrow down where to go.  They are committed to ongoing review of that information because they know those kinds of campaigns get outdated really fast.  What is relevant to the community today might not be relevant to the community in two or three years, so they did not want to just keep doing the same thing and hoping to get a different result.  Once something appears out of date, people start to ignore it.  Or if they have seen it too many times, they start to ignore it.  A communications specialist is on their team who previously did communications for the banking industry and other industries outside of health care.  Health care has a reputation for continuing to let things get out of date and are not really fresh, so it was really important to have a true expert to continually work on that.

The Tribe also has a treatment program brochure and does things in the Tribal News.  They have an actual branding guideline that all of these things follow.  The idea is that when people in their community see it, they know it is about problem gambling, they know it is coming from the Tribe, and they pay attention to it.  Often times in clinics there are lots of things that are printed off a computer and posted all over the walls.  They really try to avoid that by having a branding scheme going on.  It has taken a long time for this to be sold to their community.  The PSA video was too large to include on the PowerPoint, but she offered to send it to anyone who was interested in seeing it.  It is not a secret; they do not want to have too much ownership of it, but want it out there for people.

The community assessment came up with the tagline, "By not gambling today, I was able to spend more time with my family."  People feel that gambling really draws time away from the family, which is the center of their culture.  That seemed to be something that really hit home for people.  They have a 1-800 number hotline, but those posted in their community have the clinic phone number.  They did not use their community members' pictures in the posters, but consciously went out and got actors to use because of confidentiality and other issues with people everyone knows.  They did proof all the pictures of the people and their tone of voice with their community to make sure that, even though this person was not from their community, it still reflected what would connect them to the community.

The Puyallup Tribe serves 10 to 12,000 patients a year from about 250 different tribes around the country.  Only about 17 percent of their patient population is Puyallup Tribal members.  There are different levels of acculturation in their culture.  To really look at the community and find out what resonates with them cannot just be what resonates with this 17 percent.  Instead of using people, they tried the traditional use of animals, symbols, and culture in their campaign.  There was a lot of concern about the people who gamble because they do not have a big family to spend their time with.  The wolf poster is an example of one of the other ways they went.  It says, "As I became lost in gambling, the trickster inside of me took over until I asked for help."  Culturally, this animal is known as a trickster.  Their brochure is tri-fold and follows their branding guideline:  green for treatment and with the basket design on the front so that people recognize it and it resonates with the community.  Those baskets were woven by a Puyallup Tribal member, and were photographed for this purpose.  A Tribal newspaper comes out bi-weekly and is used for education prevention.  About once a month, there are different articles in the newspaper on problem gambling and the

treatment program.  Treatment counselors provide those articles to the Communications Director who gets them in the Tribal News.  It is something that is done to continually reach the Tribal community and goes out to all Tribal members and is available throughout the community for other people.  A lot of people in their clinic who are not Tribal members pick up the paper and read it all the time.

Community outreach has set aside one day each quarter where the clinic is open only to Puyallup Tribal elders who are 55 and older.  There is a problem gambling table and counselors are there talking to people.  It is pretty effective, because the clinic is closed to everybody else so it is not a busy day.  It is a very slow, relaxed day, but it reaches their prime population because the elders direct the rest of the community.  So if the elders get the message, it impacts whole families.  A Tribal youth outreach program works with a lot of youth programs and events.  Some of the problems start really young or are impacted by someone else in their family who is doing this behavior.  The Chief Leschi School has had programming for education and outreach prevention and a drop-in session for problem gambling education was recently started.  The biggest thing they hear people say is "I have a family member, how do I know if it is a problem?"  This group is offering more information and a class where they can come and learn.  The Tribe is really trying to get people to its door by saying people do not have to have a problem to talk to the counselors or know what is going on.  The flyer for the education group has the same branding.  The program has been able to implement universal screening for problem gambling in their medical clinic and throughout their behavioral health.  A five-question screening tool has been put into an electronic health record, which is shared between behavioral health, chemical dependency, mental health, dental health, medical health, and the pharmacy.  Everybody shares the electronic health record, which is a new development.  Before, everyone had their own paper chart and nobody knew what the other was doing.  Now, if a person is screened in medical, their counselor can see it.  It is not used 100 percent of the time, but it is in the record and their providers are being pushed to use it 100 percent of the time.  It takes time, and other things seem more important so they skip over it, but it is being pushed on them.

The program is also working on the outcomes of those screenings to turn into referrals.  Ten years ago during tobacco cessation, the Tribe learned that people can be asked about it the first 15 times they come in and they will not say anything, but then the 16th time they are asked, they will say "yes, actually I will take that referral now."  The program also provides outpatient treatment where an assessment is done and they have individual and group sessions.  The numbers are very low in those, but they are trying to do all of these other things out in the community to make sure people start to recognize the problem and come forward.  The program also refers out for inpatient treatment, which had been done for the Youth Chemical Dependency Treatment.  When they started doing referrals for problem gambling, they said they were going to do the same values.  The Tribe believes pretty strongly in not sending its people somewhere that none of the counselors have seen.  So before it becomes part of a referral network, someone from the clinic has to actually do a site visit with the treatment center because it is never known what the quality is, based on the website or talking to the person who answered the phone.  An inpatient preferred referral network is being developed, but it will be slow because each place needs to be visited.  That is a protection that is put out there for the Tribe's community members.  Ms. LaPointe did not know if that was unique or not, but it seemed like it was to her.

There are a lot of other things that are currently being done, like community-needs assessments that are being done on a three- year cycle.  Every three years, at a minimum, the counselors go back to their community and ask whether the program is happening the way that people want it to be, what could be done better, what could be done differently, and if trends in the community have changed.  It is important to make sure the program stays fresh and on top because there is no real point in continuing to work to develop something that is not fitting the needs of the community.  That is also done in the diabetes program and a lot of other programs because a lot of work can go into something that ultimately is not reaching the community.  They are also looking at developing treatment for social media, internet addictions, text messaging, and all those other kind of things that are out there that treatment programs are being developed for.  This fits in with where gambling is going with the internet gambling phase, so their program will be able to have more experts on those types of addictive behaviors.  That is where the Tribe is headed.

**Senator Conway** asked if their program had non-tribal and tribal counseling in its facilities.  **Ms. LaPointe** replied their program serves 250 Tribes.  It does not do counseling for non-Natives, but does counseling for non-Puyallup Tribal members.  The program generally does not serve non-Natives in its clinic, except that sometimes services are provided to spouses of tribal members and step-children who are non-Natives but are still under the care of their tribal parents.  If they are an actual member of a tribal household and their Behavior Health (mental or addictive behavior) is affecting a tribal family, then the Tribe can make an exception and see them.  Mainly that is based on capacity because they are serving a very large Native population in Pierce County and are already having a hard time serving all of them.  The program has already maxed out on its capacity just serving the people the Tribe is required to serve by Indian Health Service.

**Chair Ellis** asked if there were any other questions; there were none.  He thanked Ms. LaPointe for an extremely impressive program.

### Approval of Minutes – April 11-12, 2013, Commission Meeting

**Chair Ellis** asked if there were any suggested changes or corrections to the minutes; there were none.

**Commissioner Amos** made a motion seconded by **Commissioner Gray**  to approve the minutes from the April 11-12, 2013, Commission meeting as submitted.  The v*ote was taken; the motion passed with four aye votes.*

### ADMINISTRATIVE PROCEDURE ACT PROCEEDINGS

### New Licenses and Class III Certifications

**Assistant Director Tina Griffin** reported there were no unusual items or anything to draw the Commission's attention to.  Staff recommends approval of all licenses and class III certifications listed on pages 1 through 18.

**Commissioner Gray**  made a motion seconded by **Commissioner Prentice** to approve the new licenses and class III certifications listed on pages 1 through 18.  The v*ote was taken; the motion passed with four aye votes.*

### *Rule Up For Discussion and Possible Filing*

**Staff Proposed Rule Change:  Fingerprinting applicants**

Amendatory Section: **WAC 230-03-060** Fingerprinting of applicants

**Assistant Director Griffin** reported that RCW 9.46.070(7) requires the Commission to fingerprint and conduct national criminal history background checks on any person seeking a license, certification, or permit.  It is also required for a person who holds any interest in any gambling activity, building, equipment used in those activities, or who participates as an employee of a gambling activity.  The RCW states that the Commission must establish rules to delineate which persons named in the application are subject to the requirements.  This rule proposal clarifies who does and who does not need to submit fingerprints and undergo the national criminal history background checks.  It also clarifies that staff may fingerprint substantial interest holders when staff has information that the substantial interest holder may not be qualified to be licensed or participate in the gambling activity.  It also meets the intent of the Statute and brings Commission rules in line with its current practice.  Staff anticipates little to no impact on the licensees or applicants and recommends filing the petition for further discussion.

**Chair Ellis** asked if there were any questions; there were none.  He asked if there was anyone in the audience that would like to address this proposed rule change; no one stepped forward.

**Commissioner Prentice** made a motion seconded by **Commissioner Amos** to accept for filing and further discussion WAC 230-03-060.  *The vote was taken; the motion passed with four aye votes.*

### PUBLIC MEETING

**Nominations and Election of Officers** (Effective July 1, 2013, to June 30, 2014)

**Chair Ellis** asked if there was a motion to nominate a Commissioner for the chair position.

**Commissioner Gray** nominated Commissioner Mike Amos as Commission Chair for the term expiring on June 30, 2014.  **Commissioner Prentice** seconded the nomination.  **Chair Ellis** asked if there were any competing motions to nominate any other candidate to be chair; there were none. *The vote was taken; the motion passed with three aye votes.  Commissioner Amos abstained from voting and accepted the position.*

**Chair Ellis** asked if there was a motion to nominate a Commissioner for the vice-chair position.

**Commissioner Amos** nominated Commissioner Prentice as Commission Vice Chair for the term expiring on June 30, 2014.  **Commissioner Gray** seconded the nomination.  **Chair Ellis** asked if there were any competing motions to nominate any other candidate to be vice chair; there were none. *The vote was taken; the motion passed with three aye votes.  Commissioner Prentice abstained from voting and accepted the position.*

**Other Business/General Discussion/Comments from the Public**

**Chair Ellis** opened the meeting for other business, general discussion, and comments from the public.

**Ms. Chiechi,** Recreational Gaming Association (RGA), extended her deep gratitude for Commissioner Ellis' service on the Commission. She said it has been a pleasure getting to know him. She pointed out that he runs a tight ship and that it was very much appreciated because he has conducted it very thoroughly. Although the RGA may have not liked some of the outcomes, they appreciated the ability to come before the Commission and have open dialogue. She wished Commissioner Ellis all the best in whatever is next on his life plan. The RGA will miss him.

**Chair Ellis** thanked Ms. Chiechi for her comments saying he appreciated them very much. He noted that earlier in the meeting, he had mentioned that he had enjoyed working with Ms. Chiechi, the other stakeholders in the industry, and everyone else that has participated in Commission activities.

**Commissioner Prentice** said it has really been a privilege working with Commissioner Ellis and how he approached issues in a very studious, very analytical approach. She said she hoped the Commission intended to carry on that approach, noting that Commissioner Ellis had put a real stamp on this Commission that she hoped would last for a very long time.

**Chair Ellis** recalled mentioning on several occasions the amount of input and education that he had received from Commissioner Prentice through a number of telephone calls and conversations throughout the time he has been on the Commission, particularly in the early years when he desperately needed that education. It has been really valuable to him, and he really appreciated Commissioner Prentice's words.

**Commissioner Gray** said she really appreciated the mentor that Commissioner Ellis has been for her this past year.

**Chair Ellis** thanked Commissioner Gray. He asked if there was any more public comment on any topic; there was none.

**Executive Session to Discuss Pending Investigations, Tribal Negotiations, Litigation, and the Qualifications of Applicants for the Director Position**

**Chair Ellis** explained he expected the executive session to last approximately 90 minutes, and then the meeting would be resumed for the purpose of selecting applicants to be interviewed by the Commission for the Director position. He noted the next meeting was scheduled for July 11 and 12 at the Bellevue Red Lion and suggested checking the Commission website prior to the meeting date for information on whether the meeting would be one or two days. He called for a break at 12:50 p.m. and called the Executive Session to order at 1:00 p.m.

**Chair Ellis** called the public meeting back to order at 3:05 p.m. He reported that in the executive session, Ms. Benavidez provided the Commissioners with applications for eight applicants who met the minimum qualifications for the Director position. They reviewed each of the applications,

including the application from candidate #1 who was deemed to stand out based on qualifications, as well as the applications for candidates #2 through #8 who would be good applicants for many positions.  Based on that review, he asked if there was a motion concerning which applicant or applicants should be included in the interview process by the Commission for the position of Director of the Washington State Gambling Commission.

**Commissioner Prentice** made a motion seconded by **Commissioner Amos** that Ms. Benavidez schedule candidate #1 for an interview by the Commissioners.

Senator Prentice said it was very clear that, as they looked over the entire field, candidate #1 had many good qualities and believed this one jumped out, particularly with all of the background included.

*The vote was taken; the motion passed with four aye votes.*

**Adjourn**

**Chair Ellis** adjourned the meeting at 3:10 p.m.

Minutes submitted to the Commission for approval,

Gail Grate, Executive Assistant

*Exhibit G*



# Washington State Gambling Commission

**Mission Statement:**

*"Protect the Public by Ensuring That Gambling is Legal and Honest"*

# Social Gaming

## May 9, 2013

**Paul Dasaro, Administrator**
**Rick Herrington, Program Manager**

# Social Gaming

## GAMBLING COMMISSION MEETING

## PAUL DASARO: ELECTRONIC GAMBLING LAB
## RICK HERRINGTON: CRIMINAL INTELLIGENCE UNIT

# What is Social Gaming?

- No universally accepted definition
- Electronic games characterized by:
  - Online play
  - Multiple players (can also be played solo)
  - Use of social media (Facebook)
  - Virtual game play credits
  - In-game purchases
- Most are not casino-style games
- $8 Billion revenue
- 78 million players in US, 200 million worldwide

# Player motivation

- Community based game play
- Competition
- Player statistics
- Virtual cash
  - Not necessary to "buy" virtual cash
  - If bought it is done with real money
  - Enhancement of game play
  - Avatar development

# Example Video – Candy Crush



# Example Video – Zynga Poker



© 2011 Zynga Inc. All rights reserved.

# Example Video– DoubleDown Casino Slots



# Example – Virtual Credits



# Playing Mediums

Most internet-capable devices

- Desktop computers
  - Web browser
  - Specialized software
- Mobile devices
  - Smartphones (iPhone, Android)
  - Tablets (iPad, Kindle, Android)
  - Other mobile devices (iPod, MP3 players)

# Mobile Platforms

- iOS  - iPhone, iPad, iPod
  - Apple
  - Closed environment
  - 21% market share smartphones
- Android – Most others
  - Google, Samsung, Amazon
  - Open environment
  - 75% world wide market share smartphones

# Companies

Casino style games
- Double Down (IGT)
- Zynga
- Bigfish
- Slotmania

Other games
- King
- Wooga
- Popcap
- Playfish
- Gree

# Is Social Gaming Gambling?

- Gambling = Chance, consideration, prize
- Not in its current format in Washington State
- Chance – yes
- Consideration – yes
  - Real money purchases virtual currency
- Prize – not in the current format
  - Virtual currency cannot be converted to real money
  - Enjoyment

# *Exhibit H*



## Protect the public by ensuring that gambling is legal and honest.

Home » News » Press Releases » Statement regarding access to free online poker sites

# Statement regarding access to free online poker sites

Posted on: April 04, 2018

Last Thursday, the Ninth Circuit Court of Appeals issued a published decision in Kater v. Churchill Downs Inc. (Big Fish Casino). The Court found that Big Fish Casino's use of virtual casino chips within its games constitutes gambling under the Washington State Gambling Act, and remanded the case back to the U.S. District Court to allow the civil lawsuit to proceed forward.

Since the decision was published, we have become aware that some online social gaming websites, including Poker Stars, have proactively made the business decision to deny Washington residents access to their sites. We are not a party to the civil court case, we did not testify in the case, and we did not order these sites to discontinue free online play for Washington residents. Customers with concerns should contact these websites directly.

Media Contact:
Heather Songer
Public Information Officer
Washington State Gambling Commission
(360) 486-3485 desk
(360) 584-2877 cell
heather.songer@wsgc.wa.gov

© Copyright 2018 by the Washington State Gambling Commission. All Rights Reserved.

*Exhibit I*



## Protect the public by ensuring that gambling is legal and honest.

Home » News » Press Releases » Director's statement regarding Ninth Circuit Court of Appeals' published decision in Kater v. Churchill Downs

# Director's statement regarding Ninth Circuit Court of Appeals' published decision in Kater v. Churchill Downs

Posted on: April 17, 2018



From Director David Trujillo:

"On March 29, 2018, the United States Court of Appeals for the Ninth Circuit published a decision in Kater v. Churchill Downs (Big Fish Casino). The civil case was brought by a former Big Fish Casino customer who claimed she had lost more than $1,000 in virtual chips on the site. The Court of Appeals' decision reverses an earlier dismissal by the United States District Court for the Western District. In short, the Ninth Circuit panel found that the use of virtual casino chips within Big Fish Casino's games constitutes gambling under Washington law. Specifically, the panel held that virtual chips (which may be purchased or won) extend the privilege of playing Big Fish Casino and are a 'thing of value,' which led them to conclude that Big Fish Casino constitutes illegal gambling under Washington law. The case has been remanded back to the U.S. District Court to allow the civil lawsuit to proceed. The defendant, Churchill Downs, also has the right to appeal the Ninth Circuit panel's decision. It is important to note that the case could continue for another two or three years.

"As a result of the Court of Appeals' decision, some online social gaming platforms have made the business decision to no longer allow Washington residents access to their sites. We continue to receive communications from angry customers holding the Washington State Gambling Commission responsible for their discontinued service. We are not a party to the civil court case, we did not testify in the case, and we did not order these sites to discontinue free online play for Washington residents. Customers with concerns should contact these websites directly."

Read the full published decision

Media Contact:

Heather Songer

Public Information Officer

Washington State Gambling Commission

(360) 486-3485 desk

(360) 584-2877 cell

heather.songer@wsgc.wa.gov

© Copyright 2018 by the Washington State Gambling Commission. All Rights Reserved.