The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

DONNA REED, individually and on behalf of all others similarly situated,

        *Plaintiff,*

    *v.*

SCIENTIFIC GAMES CORP., a Nevada corporation,

        *Defendant.*

Case No. 18-cv-00565-RSL

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND FOR PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

**Noting** Date: May 7, 2021

**FILED UNDER SEAL**

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

## TABLE OF CONTENTS

**INTRODUCTION**...........................................................................................................1

**BACKGROUND**.............................................................................................................3

  **I.**   **Factual Background.**..............................................................................3

  **II.**  **Legal Background.**.................................................................................5

**ARGUMENT**..................................................................................................................7

  **I.**   **The Court Should Certify Both Proposed Classes.**...........................7

      A. Both Proposed Classes Satisfy Rule 23(a). ...............................8

           1. *Both proposed classes are sufficiently numerous.* ................8

           2. *Both proposed classes present common questions of law and fact.* .........8

           3. *Plaintiff is appropriate representatives of the proposed classes.* ...........11

           4. *Edelson PC are adequate class counsel.* ................................13

      B. The Damages Class Satisfies Rule 23(b)(3). ...........................13

           1. *Common questions predominate.* ..........................................14

           2. *A class action is superior to separate actions.* .....................17

      C. The Injunction Class Satisfies Rule 23(b)(2). ........................18

  **II.**  **The Court Should Issue A Preliminary Injunction.** ........................19

      A. Plaintiffs are Likely to Succeed on the Merits. ......................20

           1. *Washington gambling law.*......................................................20

           2. *Consumer Protection Act.* ......................................................21

      B. Continued Operation of Social Casinos Causes Irreparable Harm. ...................26

      C. The Balance of Equities and Public Interest Favor an Injunction. ......................28

**CONCLUSION** ............................................................................................................28

**Eᴅᴇʟsᴏɴ PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Amchem Prods. Co. v. Windsor*,
    521 U.S. 591 (1997)..............................................................................................11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2014)..............................................................................................14

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016)....................................................................................14, 16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..............................................................................7, 8, 10, 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................................20

**United States Circuit Court of Appeals Cases**

*Arizona Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ......................................................................27, 28

*Chalk v. U.S. Dist. Ct. for C.D. Cal.*,
    840 F.2d 701 (9th Cir. 1988) ..............................................................................27

*Degidio v. Crazy Horse Saloon & Rest. Inc.*,
    880 F.3d 135 (4th Cir. 2018) ..............................................................................17

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ..............................................................................13

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ............................................................................11

*Hanon v. Dataproducts, Corp.*,
    976 F.2d 497 (9th Cir. 1992) ..............................................................................11

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    938 F.3d 985 (9th Cir. 2019) ..............................................................................27

*Inst. of Cetacean Research v. Sea Shepherd Conservation Soc.*,
    725 F.3d 940 (9th Cir. 2013) ..............................................................................28

**Edelson PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ........................................................................8

*Kater v. Churchill Downs Inc.*,
886 F.3d 784 (9th Cir. 2018) ...............................................................2, 9, 20

*Nelson v. NASA*,
530 F.3d 865 (9th Cir. 2008) ........................................................................27

*Silver Stage Partners, Ltd. v. City of Desert Hot Springs*,
251 F.3d 814 (9th Cir. 2001) ........................................................................26

*Torres v. Mercer Canyons Inc.*,
835 F.3d 1125 (9th Cir. 2016) ......................................................................14

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ......................................................................28

*Zinser v. Accufix Research Inst.*,
253 F.3d 1180 (9th Cir. 2001) ........................................................................7

**United States District Court Cases**

*Balasanyan v. Nordstrom, Inc.*,
No. 10-cv-2671, 2012 WL 760566 (S.D. Cal. Mar. 8, 2012) ...........................17

*Bellinghausen v. Tractor Supply Co.*,
303 F.R.D. 611 (N.D. Cal. 2014).................................................................12

*Bess v. Ocwen Loan Servicing LLC*,
334 F.R.D. 432 (W.D. Wash. 2020) ..............................................................15

*B.K. by next friend Tinsley v. Snyder*,
922 F.3d 957 (9th Cir. 2019) ........................................................................18

*Davis v. Four Seasons Hotel Ltd.*,
No. 08-cv-00525, 2011 WL 4590393 (D. Haw. Sept. 30, 2011).......................16

*Earthwise Techs., Inc. v. Comfort Living, LLC*,
No. 09-cv-5266, 2009 WL 2486159 (W.D. Wash. Aug. 12, 2009)...................26

*Fife v. Sci. Games Corp.*,
No. 2:18-cv-00565-RBL, 2018 WL 6620485 (W.D. Wash. Dec. 18, 2018)................4, 21

*G.G. v. Valve Corp.*,
No. 16-cv-1941, 2020 WL 7385710 (W.D. Wash. Dec. 16, 2020) ...................22

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

*In re Currency Conversion Fee Antitrust Litig.*,
        361 F. Supp. 2d 237 (S.D.N.Y. 2005)............................................................17

*Jimenez v. Menzies Aviation Inc.*,
        No. 15-cv-02392, 2015 WL 4914727 (N.D. Cal. Aug. 17, 2015) ....................17

*Kater v. Churchill Downs, Inc.*,
        423 F. Supp. 3d 1055 (W.D. Wash. 2019)......................................................16

*Kater v. Churchill Downs Inc.*,
        No. 15-cv-612 (W.D. Wash. Feb. 20, 2020).....................................................5

*Kelley v. Microsoft Corp.*,
        251 F.R.D. 544 (W.D. Wash. 2008) ...............................................................18

*McKee v. Audible, Inc.*,
        No. 17-cv-1941, 2018 WL 2422582 (C.D. Cal. Apr. 6, 2018).........................17

*Miller v. P.S.C., Inc.*,
        No. 3:17-cv-05864-RBL, 2018 WL 6249841 (W.D. Wash. Nov. 29, 2018) ....................8

*Mora v. Harley-Davidson Credit Corp.*,
        No. 1:08-cv-01453, 2012 WL 1189769 (E.D. Cal. Apr. 9, 2012) ....................16

*Moreno Galvez v. Cuccinelli*,
        387 F. Supp. 3d 1208 (W.D. Wash. 2019)......................................................28

*OConner v. Agilant Sols., Inc.*,
        444 F. Supp. 3d 593 (S.D.N.Y. 2020).............................................................17

*Piekarski v. Amedisys Ill., LLC*,
        4 F. Supp. 3d 952 (N.D. Ill. 2013) .................................................................17

*Reichert v. Keefe Commissary Network, LLC*,
        331 F.R.D. 550 (W.D. Wash. 2019) .....................................................8, 11, 14

*Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*,
        No. 2:16-cv-1211 WBS AC, 2019 WL 358517 (E.D. Cal. Jan. 29, 2019)........18

*Taylor v. Universal Auto Grp. I, Inc.*,
        No. 3:13-cv-05245-KLS, 2014 WL 6654270 (W.D. Wash. Nov. 24, 2014)...............7, 14

*T-Mobile USA, Inc. v. Huawei Devices USA Inc.*,
        115 F. Supp. 3d 1184 (W.D. Wash. 2015)......................................................6, 22

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

*Walters v. Reno*,
    No. 94-cv-1204, 1996 WL 897662 (W.D. Wash. Mar. 13, 1996) ....................................19

*Wilson v. PTT, LLC, d/b/a High 5 Games, LLC*,
    No. 18-cv-5275 (W.D. Wash. June 26, 2020) ..............................................1, 5

*Wilson v. PTT, LLC, d/b/a High 5 Games, LLC*,
    No. 18-cv-5275-RSL, 2021 WL 211532 (W.D. Wash. Jan. 21, 2021).................... *passim*

**Washington Supreme Court Cases**

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
    719 P.2d 531 (Wash. 1986)..................................................................6, 21, 22

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*,
    170 P.3d 10 (Wash. 2007)...................................................................21

*Klem v. Washington Mut. Bank*,
    295 P.3d 1179 (Wash. 2013)...........................................................21, 22

**Washington Court of Appeals Cases**

*Mellon v. Reg'l Tr. Servs. Corp.*,
    334 P.3d 1120 (Wash. Ct. App. 2014) .................................................10, 23, 25

**Miscellaneous Authority**

2 NEWBERG ON CLASS ACTIONS § 4:49 (5th ed.) ..........................................14

Christopher T. Pickens, *Of Bookies and Brokers: Are Sports Futures Gambling or Investing,
    and Does It Even Matter?*,
    14 Geo. Mason L. Rev. 227, 243 (2006) ...........................................24

Fed. R. Civ. P. 23 ..................................................................... *passim*

Jonathan Gottfried, *The Federal Framework for Internet Gambling*,
    10 Rich. J. L. & Tech. 26, 28 (2004) ...............................................24

RCW 4.24.070 ...............................................................................5, 6, 9

RCW 9.46.010 ........................................................................... *passim*

RCW 9.46.071 .................................................................................24

RCW 9.46.0237 ................................................................................6, 9

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

RCW 9.46.250 ...................................................................................................19, 26

RCW 9.46.0285 ........................................................................................................6

RCW 19.86.010 ......................................................................................................21

RCW 19.86.090 ..................................................................................................6, 26

RCW 19.86.920 ......................................................................................................28

WAC 230-06-015 ...................................................................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

## **INTRODUCTION**

This lawsuit alleges that Defendant Scientific Games owns and operates internet casinos that are illegal under Washington law. It is one of several related cases before this Court alleging functionally identical claims against Defendant's industry peers. The Court recently granted class certification for Washington players in one of those cases, *Wilson v. High* 5, No. 18-cv-5275. Plaintiff Donna Reed now seeks certification of substantially identical classes of Washington players in this case.

Scientific Games and its subsidiary SciPlay own and operate a cohort of social casino games featuring slot machine-style gameplay, including Jackpot Party Casino, Gold Fish Casino, Hot Shot Casino, and Quick Hit Slots. These slot games are, for good reason, prohibited in Washington. The business model employed by Scientific Games and its industry peers is to target vulnerable consumers, enticing them to spend thousands of dollars on virtual chips to wager on unregulated slot machines, all from the comfort of the consumers' homes.

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

1    ███████████████████████████████████████████

2    ██████████████████████████████████████████████

3    ██████████████████████████████████████████████

4    ████████████████████████████████████

5    These financial losses are just the tip of the iceberg. Putative class members have

6    provided sworn testimony as to how their addictions to these handheld slot machines have

7    impacted their lives, straining players' relationships, making it difficult to put food on the table,

8    and causing shame and emotional distress. *See infra* Section II.B.

9    Defendant's business model is also completely illegal. *See generally Kater v. Churchill*

10   *Downs Inc.*, 886 F.3d 784, 789 (9th Cir. 2018). Washington tightly regulates gambling: slot

11   machines are banned, and casinos must adhere to a strict regime of licensing and oversight. At

12   least since the launch of Jackpot Party Casino in 2012, Defendant has been flouting these

13   gambling laws. That decision has, to date, been a fantastically lucrative one for Defendant—and

14   a financially devastating one for consumers. This lawsuit seeks to change that.

15   Plaintiff Donna Reed, a Washington consumer who has lost money playing Jackpot Party

16   Casino, seeks to certify damages and injunction classes to efficiently resolve her claims against

17   Defendant. Because the central issues of this case—including whether the virtual chips in

18   Jackpot Party Casino are "things of value" under Washington law—are common to every

19   member of the proposed classes, this case is ideally situated to proceed as a class action.

20   Defendant's liability under Washington law is a common—indeed, predominating—issue for

21   every member of the proposed classes.

22   Plaintiff also seeks an immediate preliminary injunction to stop Defendant's ongoing

23   violations of Washington law and public policy, and to prevent further harm to the thousands of

24

---

1       Figure 1 reflects Plaintiff's counsel's analysis of data Apple Inc. produced pursuant to a subpoena issued out of this case as "APL-FIFE_00001475." *See* Declaration of Todd Logan ("Logan Decl.) ¶ 3. Apple has represented to Plaintiff's counsel that the data reflects Jackpot Party Casino and Gold Fish Casino purchases made on iOS devices associated with Washington accounts between approximately June 2014 and May 2020. *Id.* ¶ 4. The underlying data, which reflects the same, is attached as Exhibit 1 (lodged with the Court as USB Drive #1) to the Logan Declaration. *See id.*

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

1  Jackpot Party Casino players whose spiraling losses jeopardize their financial stability, their

2  relationships, and their mental well-being.

3        The Court should certify the proposed classes and issue a preliminary injunction.

4                                    **BACKGROUND**

5  **I.    Factual Background.**

6        When Plaintiff filed this lawsuit, Defendant Scientific Games Corp. ("Scientific Games")

7  owned and operated Jackpot Party Casino and the other at-issue slot machine apps. In late 2018,

8  around the time the Court denied Scientific Games' motion to dismiss (and those filed by other

9  defendants in other related cases), Scientific Games spun its social casino division out into a

10  controlled subsidiary called SciPlay Corporation ("SciPlay").

11        As a controlled subsidiary of Scientific Games, SciPlay now—acting in concert with

12  Scientific Games—operates Jackpot Party Casino and a portfolio of other social casino games

13  that allow consumers to play Las Vegas-style slot machine games, twenty-four hours a day, from

14  their mobile devices and personal computers. Logan Decl. ¶¶ 5, 6, Exhibit 2, Scientific Games

15  2020 Form 10-K at 91-92 (After SciPlay's partial initial public offering in May 2019, "SGC

16  owned . . . approximately 82.0% of SciPlay's total outstanding shares of common stock and

17  approximately 97.8% of the combined voting power of both classes of SciPlay's outstanding

18  common stock."); Exhibit 3, SciPlay Amendment 3 to Form S-1 at ECF 72 (Apr. 29, 2019) (IPO

19  Prospectus) ("SciPlay was incorporated as a Nevada corporation on November 30, 2018").

20  Scientific Games lists SciPlay as one of its own "business segments," *see* Exhibit 2 at 8, and

21  SciPlay revenue flows to Scientific Games, *id.* at 32 ("SciPlay generates 41% of our operating

22  cash flows."). Scientific Games's President and CEO is also the Chairman of the Board of

23  Directors of SciPlay, and the two corporations share the same Chief Accounting Officer. *Id.* at

24  17-18. And when communicating with investors, Scientific Games talks about SciPlay's

25  operations as party of "our strategy." *Id.* at 28-29 (discussing strategy in the SciPlay business

26  segment, including competition with other social casino games, and the potential effects on "our

27  results of operations, cash flows, and financial condition"). Indeed, SciPlay's post-litigation

**Edelson PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

1  spinoff and IPO was part of Scientific Games's business strategy. *Id.* at 32 (Scientific Games

2  expected "strategic and financial benefits . . . as a result of SciPlay being a standalone public

3  company."). SciPlay relies on Scientific Games for access to intellectual property under an "IP

4  License Agreement," *see* Exhibit 3 at ECF 19, and also for services "relating to many important

5  corporate functions" under an "Intercompany Services Agreement," *see* Logan Decl. ¶ 7 Exhibit

6  4, SciPlay 2019 Form 10-K at 30 (explaining SciPlay's reliance on "certain functions, systems

7  and infrastructure" provided by Scientific Games, as well as "Scientific Games' existing

8  operational and administrative infrastructure").

9         Scientific Games's and SciPlay's social casino games—which include Jackpot Party

10  Casino, Quick Hit Slots, Gold Fish Casino, Hot Shot Casino, and others (together, "Jackpot Party

11  Casino")[2]—are materially indistinguishable from each other insofar as they all permit users to

12  purchase virtual coins, chips, or bingo cards to play slot games and other games of chance.

13  Exhibit 2 at 64. In support of this motion, Plaintiff is submitting to the Court an iPad containing a

14  current version of each above-described app and respectfully requests that the Court take judicial

15  notice of each. *See* Logan Decl. ¶ 8, Exhibit 5 (iPad containing Defendant's social casino

16  games); *see also Fife v. Sci. Games Corp.*, No. 18-cv-00565-RBL, 2018 WL 6620485, at *3

17  (W.D. Wash. Dec. 18, 2018) (taking judicial notice of social casino games lodged via iPad).

18         Like other social casino games, Jackpot Party Casino imitates brick-and-mortar casinos in

19  its games, featuring realistic, casino-like slot machines, the background noise of a brick-and-

20  mortar casino, and the celebratory noises associated with slot machine jackpots. *See* Exhibit 5

21  (iPad containing Defendant's social casino games). Unlike its brick-and-mortar brethren,

22  however, Jackpot Party Casino offers none of the protections required of "real"—regulated—

23  casinos, which include prominent displays of addiction hotlines, self-exclusion programs, and

24  prohibition of intoxicated players.

25  ―――――――――――――――――

26  [2]      Jackpot Party Casino "has accounted for a substantial portion of [Defendant's] revenue since its launch in 2012, including 49% of [its] revenue in 2017." *See* Exhibit 4 at 12. For conciseness and brevity purposes, the remainder of this brief will refer to Scientific Games's and

27  SciPlay's social casino games together as "Jackpot Party Casino."

1    When consumers visit Jackpot Party Casino for the first time, they are awarded free

2    chips. Players use those chips to play Defendant's animated slot machines, choosing the amount

3    they wager on any particular spin. *See* Logan Decl. ¶ 9; Dkt. 78 ("FAC"), Fig. 3. Virtual chips

4    are won and lost based on the outcome of spins. Once a player loses their initial allotment of free

5    chips, Jackpot Party Casino informs consumers via a pop-up screen to "PURCHASE a coin

6    package above to keep spinning." Logan Decl. ¶ 10, FAC, Fig. 2. At this point, players have

7    three options: (i) stop playing, (ii) wait for some period of time before receiving more free chips,

8    or (iii) purchase more chips to keep playing. To keep playing immediately, players must

9    purchase chips packages costing up to $99.99. *See* Logan Decl. ¶ 11; FAC, Fig. 1. These

10   purchased chips can then be used on the virtual slot machines to extend gameplay. Defendant

11   also periodically displays various special offers to consumers via a pop-up in order to entice

12   them to purchase additional chips. *Id.* (advertising a "sale" on chips).

13   According to SciPlay, players generally do not purchase more chips until they have

14   effectively run out of chips. *See* Exhibit 4 at 65. And chips typically do not last very long: the

15   period of time between the purchase and consumption of virtual chips in Jackpot Party Casino

16   "is relatively short." *Id.* That is consistent with social casinos operated by Defendant's industry

17   competitors, in which chips typically last only 1-3 days before a consumer spends them. *See* Pl.'s

18   Mot. for Class Certification, Dkt. 143 at 21, *Wilson v. PTT, LLC, d/b/a High 5 Games, LLC*, No.

19   18-cv-5275 (W.D. Wash. June 26, 2020) (hereafter "*High 5*") ("[P]urchased chips are lost, on

20   average, within one day."); Pls' Mot. for Class Certification, Dkt. 176 at 18, *Kater v. Churchill*

21   *Downs Inc.*, No. 15-cv-612 (W.D. Wash. Feb. 20, 2020) ("[P]urchased chips are lost, on average,

22   within three days of purchase." (citing Churchill Downs' 2017 10-K Filing)).

23   **II.      Legal Background.**

24   Plaintiff alleges that Jackpot Party Casino is illegal under Washington's gambling law,

25   and that she may recover her losses under the Recovery of Money Lost at Gambling Act

26   ("RMLGA" or the "Act"), RCW 4.24.070. The Washington legislature has declared that: "The

27   public policy of the state of Washington on gambling is . . . to promote the social welfare of the

1    people by limiting the nature and scope of gambling activities and by strict regulation and

2    control." RCW 9.46.010. To that end, the Act establishes that "[a]ll persons losing money or

3    anything of value at or on any illegal gambling games shall have a cause of action to recover

4    from the dealer or player winning, or from the proprietor for whose benefit such game was

5    played or dealt, or such money or things of value won, the amount of the money or the value of

6    the thing so lost." RCW 4.24.070. Thus, to recover under the Act, Plaintiff must show that she

7    (1) lost money or a thing of value (2) at an illegal gambling game.

8         That burden implicates two other terms defined by the law. First, in pertinent part,

9    Washington's gambling law defines "thing of value" as "any form of credit or promise . . .

10   involving extension of . . . entertainment or a privilege of playing at a game or scheme without

11   charge." RCW 9.46.0285. Second, the gambling law defines "gambling" as the "[1] staking or

12   risking something of value [2] upon the outcome of a contest of chance or a future contingent

13   event not under the person's control or influence, [3] upon an agreement or understanding that

14   the person or someone else will receive something of value in the event of a certain outcome."

15   RCW 9.46.0237. Plaintiff's core contention is that the virtual chips offered to players in Jackpot

16   Party Casino are things of value, and that her purchase of those chips, therefore, caused her to

17   lose money at an illegal gambling game.

18        Additionally, Plaintiff contends that the operation of Defendant's illegal gambling games

19   constitutes an unfair practice under Washington's Consumer Protection Act ("CPA"), in part

20   because Washington's gambling law features a legislative declaration of public interest in strictly

21   regulating gambling activities. *See* RCW 9.46.010; *T-Mobile USA, Inc. v. Huawei Devices USA*

22   *Inc.*, 115 F. Supp. 3d 1184, 1197 (W.D. Wash. 2015) ("As an alternative to demonstrating (or

23   pleading) an impact on the public interest, a CPA plaintiff can establish a per se public interest

24   impact by 'showing that a statute has been violated which contains a specific legislative

25   declaration of public interest impact.'") (quoting *Hangman Ridge Training Stables, Inc. v. Safeco*

26   *Title Ins. Co.*, 719 P.2d 531, 538 (Wash. 1986)). The CPA permits recovery of monetary

27   damages, which may be trebled. RCW 19.86.090. In addition to damages actions, the CPA also

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

1  permits an "action . . . to enjoin further violations." *Id.*

2      Given these available remedies, Plaintiff seeks to certify the following two classes:

3      **(a) Damages Class**: All persons who purchased virtual casino chips in Jackpot Party
       Casino, Gold Fish Casino, Hot Shot Casino, or Quick Hit Slots on or after April 17,
4      2014 in Washington.

5      **(b) Injunction Class**: All persons who played Jackpot Party Casino, Gold Fish Casino,
       Hot Shot Casino, or Quick Hit Slots on or after April 17, 2014 in Washington.
6

7      Finally, Plaintiff seeks a preliminary injunction because her success on the merits is a

8  near certainty in this case, members of the proposed classes are continuing to suffer tragic and

9  irreparable harms due to Defendant's ongoing violations of Washington law, and an immediate

10 preliminary injunction will further the public interest.

11                                    **ARGUMENT**

12 **I.    The Court Should Certify Both Proposed Classes.**

13     "Class certification is governed by Federal Rule of Civil Procedure 23." *Wal-Mart Stores,*

14 *Inc. v. Dukes*, 564 U.S. 338, 345 (2011). To obtain certification, Plaintiff must demonstrate that

15 her proposals satisfy "each of the four requirements of Rule 23(a) and at least one of the

16 requirements of Rule 23(b)." *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir.

17 2001); *see Wal-Mart*, 564 U.S. at 350 ("A party seeking class certification must affirmatively

18 demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in

19 fact sufficiently numerous parties, common questions of law or fact, etc."). Likewise, the Court

20 "must conduct a rigorous analysis" to determine whether Plaintiff has in fact demonstrated

21 compliance with Rule 23. *Zinser*, 253 F.3d at 1186. "Doubts regarding the propriety of class

22 certification should be resolved in favor of certification." *Taylor v. Universal Auto Grp. I, Inc.*,

23 No. 3:13-cv-05245-KLS, 2014 WL 6654270, at *8 (W.D. Wash. Nov. 24, 2014) (internal

24 quotations omitted).

25     Here, Plaintiff's proposed Damages Class must meet the requirements of Rule 23(b)(3),

26 and her proposed Injunction Class must meet the requirements of Rule 23(b)(2). *See Wal-Mart*,

27 564 U.S. at 359. As demonstrated below, Plaintiff presents a straightforward case for

1    certification that readily satisfies these prerequisites.

2         A.       Both Proposed Classes Satisfy Rule 23(a).

3         Because the two proposed Classes present essentially identical grievances, their

4    compliance with Rule 23(a) can be analyzed together.

5              1.       *Both proposed classes are sufficiently numerous.*

6         Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is

7    impracticable." There is no numerical threshold, but "40 is generally an adequate number."

8    *Reichert v. Keefe Commissary Network, LLC*, 331 F.R.D. 541, 550 (W.D. Wash. 2019).

9         Both proposed Classes easily clear this hurdle. Exhibit 1 reveals that thousands of

10   Washingtonians have purchased virtual casino chips in Jackpot Party Casino and Gold Fish

11   Casino. *See* Exhibit 1. Those users alone satisfy numerosity, and they represent only a limited

12   portion of the proposed classes. That is more than enough to satisfy numerosity here. *See Miller*

13   *v. P.S.C., Inc.*, No. 3:17-cv-05864-RBL, 2018 WL 6249841, at *3 (W.D. Wash. Nov. 29, 2018)

14   (noting that a party may satisfy the numerosity prerequisite with "reasonable inference" drawn

15   from the evidence).

16              2.       *Both proposed classes present common questions of law and fact.*

17        Rule 23(a)(2) next requires that there be "questions of law or fact common to the class."

18   To satisfy this prerequisite, the plaintiff's claims must "depend upon a common contention" that

19   is "capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350. "Common questions are defined

20   by the plaintiffs' ability to make a prima facie showing using the same evidence." *Reichert*, 331

21   F.R.D. at 552. "[A] class meets Rule 23(a)(2)'s commonality requirement when the common

22   questions it has raised are apt to drive the resolution of the litigation, no matter their number."

23   *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (internal quotations omitted).

24        The Court recently certified the proposed classes in *High 5* and identified several

25   common questions "relat[ing] to defendant's alleged operation of a gambling game in violation

26   of Washington law" that applied to every class member and were "apt to drive the resolution of

27   one or more claims asserted." No. 18-cv-5275-RSL, 2021 WL 211532, at *3-4 (W.D. Wash. Jan.

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

21, 2021). Plaintiff here raises the same claims as the plaintiff did in *High 5*, and those same common questions will likewise drive the resolution of the claims alleged here.

*First*, one key common question is: are virtual chips in Jackpot Party Casino "things of value"? Plaintiff asserts that they are, and in support of that assertion argues that Jackpot Party Casino is materially indistinguishable from the social casino at issue in *Kater*, where the Ninth Circuit concluded that social casino virtual chips were "things of value" because they extend gameplay. 886 F.3d at 787. While Defendant has consistently argued that *Kater* does not conclusively answer whether the virtual chips in Jackpot Party Casino are "things of value" under Washington law, the fact is that all Class Members will rely on the same body of evidence to prove up their argument, and resolution of the issue will apply classwide. That fact renders this case apt for class treatment. *See High 5*, 2021 WL 211532, at *3 ("[T]he key question related to liability under RMLGA is whether the virtual chips in defendant's games are 'things of value' for purposes of RCW 4.24.070" and that the question was a common question "apt to drive the resolution of the litigation").

*Second*: are the games in Jackpot Party Casino "gambling games"? Washington defines gambling as the "[1] staking or risking something of value [2] upon the outcome of a contest of chance or a future contingent event not under the person's control or influence, [3] upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." RCW 9.46.0237. In *Kater*, the Ninth Circuit determined that "[b]ecause the virtual chips are a 'thing of value,' . . . [the social casino at issue, at which virtual chips are wagered] falls within Washington's definition of an illegal gambling game." *See Kater*, 886 F.3d at 788. Here, too, the Court will need to decide whether the slot machines in Jackpot Party Casino are "contest[s] of chance," and whether they are therefore illegal gambling games. That Court's resolution of that contention determination will be common to every member of both proposed classes.

*Third:* is the proposed Damages Class entitled to recover money under the RMLGA? The RMLGA permits recovery of money or the value of things lost at a gambling game. *See* RCW

1   4.24.070. So, if Plaintiff prevails on the first two questions listed above, the factfinder will need

2   to resolve what, if anything, members of the proposed Damages Class are entitled to recover. All

3   members of the proposed Damages Class have spent money to purchase some number of chips

4   for gambling at Jackpot Party Casino. Whether these transactions caused Damages Class

5   members to "los[e] money or anything of value," entitling them to recover the money or value of

6   the thing lost, *see id.*, is a common question that applies classwide. *See High 5*, 2021 WL

7   211532, at *3-4 (noting that "[w]hether class members' recoverable losses under RMLGA are

8   coextensive with the money they spent purchasing virtual coins" is a common question related to

9   the defendant's "alleged operation of a gambling game in violation of Washington law").

10      *Fourth*, for the Damages Class: is a violation of Washington's gambling law "unfair" for

11   purposes of the CPA? *Cf. id.* at *3. Under the CPA, "a defendant's act or practice might be unfair

12   if it offends public policy as established by statutes or the common law, or is unethical,

13   oppressive, or unscrupulous, among other things." *Mellon v. Reg'l Tr. Servs. Corp.*, 334 P.3d

14   1120, 1126 (Wash. Ct. App. 2014) (internal quotations omitted). Plaintiff argues that

15   Defendant's operation of Jackpot Party Casino is an unfair practice because it offends the public

16   policy established by Washington gambling law, *see* RCW 9.46.010, and because Defendant

17   systematically operates the casino in an unethical, oppressive, and unscrupulous manner—for

18   example, by targeting vulnerable problem gamblers. And if Plaintiff persuades the Court that the

19   operation of Jackpot Party Casino consequently constitutes a violation of the CPA, that

20   determination will apply classwide. *See High 5*, 2021 WL 211532, at *9 (describing the

21   plaintiff's theory as "viable" but insufficiently established on that factual record).

22      Each of these questions relates to Defendant's ownership and operation of an illegal

23   virtual casino, applies classwide, and is central to the resolution of Plaintiff's claims. At bottom,

24   Rule 23(a)'s commonality prerequisite is not meant to be a demanding hurdle: indeed, "even a

25   single common question will do." *Wal-Mart*, 564 U.S. at 359 (internal quotations omitted).

26   Given the multitude of common questions present in this case, both proposed classes satisfy the

27   requirement.

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

3.       *Plaintiff is an appropriate representative of the proposed classes.*

Rules 23(a)(3) and (4) are aimed at ensuring that the class is appropriately represented, and analysis of the two requirements tends to merge. *See Amchem Prods. Co. v. Windsor*, 521 U.S. 591, 626 n.20 (1997). Rule 23(a)(3) ensures that the named plaintiff is typical of the class, such that her claim is "reasonably co-extensive with those of absent class members," even if not "substantially identical." *Reichert*, 331 F.R.D. at 550 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Class representatives must have suffered the same type of injury from the same course of conduct as the absent class they seek to represent. *See Troy v. Kehe Food Distribs., Inc.*, 276 F.R.D. 642, 654 (W.D. Wash. 2011) (citing *Hanon v. Dataproducts, Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Moreover, to be typical, a proposed representative's claim must not be subject to any unique defenses that threaten to become the focus of the litigation and distract her from prosecuting the class's claims. *See Reichert*, 331 F.R.D. at 551. Rule 23(a)(4)'s adequacy requirement ensures that a class representative does not have any disabling conflicts of interest and will vigorously prosecute the action on behalf of the absent class. *See Troy*, 276 F.R.D. at 655 (citing *Hanlon*, 150 F.3d at 1020). Donna Reed satisfies both criteria.

Reed's legal claims are identical to those of both proposed classes. She alleges that she spent money to purchase chips, which she then wagered on "various slot machines and other games of chance within Defendant's casino." FAC ¶¶ 31-32. Like the members of the Damages Class she seeks to represent, Reed contends that she is entitled to recover the money she spent under the RMLGA and treble damages under the CPA. And in line with the Injunction Class members, she alleges she is entitled to injunctive relief. Reed's injuries are "of the same type and issued from the same source" as the proposed Classes, rendering her a typical plaintiff. *Reichert*, 331 F.R.D. at 551.

Reed's claims are typical of the proposed classes' even if class members played different games within Jackpot Party Casino, or some class members only played other of Defendant's social casino games (*i.e.*, Gold Fish Casino, Hot Shot Casino, or Quick Hit Slots). Defendant

1    owns and directs the operation of all of these apps, all of which share the same material features:

2    opportunities to purchase virtual chips that extend gameplay at slot machines and the occasional

3    provision of free chips. In other words, all the games present identical legal and factual questions

4    that can be resolved in a single merits proceeding. *See High 5*, 2021 WL 211532, at *4 (finding

5    class representative's claims typical when some class members played a different social casino

6    game).

7            Scientific Games may argue that Reed's claims are not typical because she purportedly

8    clicked "Accept" to a pop-up window in 2019 that purported to bind her to updated Terms of

9    Service, including an arbitration provision. *See* Dkt. 82 (Motion to Compel Arbitration). But

10   Reed did not assent to be bound by the Terms of Service, and the pop-up was a misleading and

11   coercive communication to a putative class member. *See* Dkt. 88 at 5-6. The arbitration issue has

12   already been extensively briefed, *see* Dkt. 82, 88, 91, so Plaintiff will spare the Court from re-

13   hashing her arguments in this brief. The bottom line is that the Terms of Service are

14   unenforceable as to Reed, so there are no arbitration defenses that defeat typicality.

15           Reed also "will fairly and adequately protect the interests of the class," as required by

16   Rule 23(a)(4), because her interests are aligned with those of the class. Reed spent money

17   playing Jackpot Party Casino while she lived in Washington. *See* Declaration of Donna Reed ¶¶

18   1-3. Though she now resides in Oregon, that means Reed is a member of both the proposed

19   Damages Class and the proposed Injunctive Class. Reed does not have any conflicts of interest

20   that might cause her to sell out the absent class, and she is committed to vigorously prosecuting

21   this action. *See* Supplemental Declaration of Donna Reed ¶ 1. Thus far in the litigation, Reed has

22   agreed to serve as class representative—stepping in when the original class representative no

23   longer wished to serve in that role—and long ago offered available dates for her deposition, *see*

24   Dkt. 103-1 (January 25, 2021 email from Todd Logan to Adam Hoeflich). These actions satisfy

25   adequacy. *See, e.g.*, *Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 617 (N.D. Cal. 2014).

26           For these reasons, Reed satisfies both the typicality and adequacy requirements of Rule

27   23(a) and is an appropriate champion for the proposed Classes.

1                 **4.**      *Edelson PC are adequate class counsel.*

2        Rule 23(a)(4)'s adequacy prong also governs class counsel. *See Ellis v. Costco Wholesale*

3 *Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). Again, the Court must ask whether the proposed class

4 counsel, Edelson PC, is unencumbered by conflicts of interest and will vigorously prosecute the

5 action. *See id.* The answer is a clear yes.

6        First, the record discloses no conflicts of interest and counsel are aware of none. Edelson

7 PC has no financial stake in the Defendant nor any connections to particular class members that

8 might cause them to privilege certain members over others. *See* Logan Decl. ¶ 12.

9        Second, Edelson PC will vigorously prosecute this case. Its conduct to this point makes

10 clear that commitment. Lawyers at Edelson PC have litigated several complex issues—including

11 Article III standing, arbitration, and class certification—in this and related cases, and are

12 intimately familiar with the underlying facts and law. The results up to this point speak for

13 themselves: in related cases where Edelson PC was appointed Class Counsel (each of which

14 raised materially identical claims as those raised here), the Court recently granted final approval

15 of three settlements totaling approximately $200 million. And in *High 5* this Court recently

16 appointed Edelson PC as Class Counsel for adversarially-certified damages and injunctive

17 classes. 2021 WL 211532, at *9.

18        Aside from their experience in this case and the related matters, attorneys at Edelson PC

19 have a long record of successfully prosecuting consumer actions on behalf of certified classes.

20 This record includes a recent $925 million jury verdict against multilevel marketing company

21 ViSalus, *see Wakefield v. Visalus*, No. 3:15-cv-01857 (D. Or. Apr. 12, 2019), and a $650 million

22 settlement with Facebook, which the court granted final approval—the largest consumer privacy

23 jury verdict and settlement, respectively, to date. *See* Order Re Final Approval, Dkt. 537, *In re*

24 *Facebook Biometric Information Privacy Litig.*, No. 3:15-cv-3747 (N.D. Cal. Feb. 26, 2021).

25 Edelson PC is plainly adequate to serve as class counsel.

26       **B.**     <u>The Damages Class Satisfies Rule 23(b)(3).</u>

27        Plaintiff's proposed Damages Class must satisfy Fed. R. Civ. P. 23(b)(3), which permits

1  certification when common questions predominate over individual questions affecting particular

2  class members, and when a class action is a superior way of resolving the dispute.

3       1.  *Common questions predominate.*

4       First, common questions predominate in this case. Predominance is a qualitative inquiry

5  that "asks whether the common, aggregation-enabling, issues in the case are more prevalent or

6  important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v.*

7  *Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 NEWBERG ON CLASS ACTIONS § 4:49 (5th

8  ed.)). When considering whether common issues predominate, the Court begins with "the

9  elements of the underlying cause of action." *Reichert*, 331 F.R.D. at 553 (quoting *Erica P. John*

10 *Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2014)). "More important questions apt to drive

11 the resolution of the litigation are given more weight in the predominance analysis over

12 individualized questions which are of considerably less significance to the claims of the class."

13 *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). As these cases and the text

14 of the rule make clear, individual questions need not be absent, but merely must occupy less

15 importance to the litigation than common questions.

16      In *High 5*, this Court certified a damages class almost identical to the proposed Damages

17 Class here. The common questions present in both cases—*e.g.*, whether virtual chips in social

18 casinos are "things of value," whether social casino slot machines constitute "gambling" under

19 Washington law, whether money spent on virtual chips is recoverable under the RMLGA, and

20 whether violations of gambling law are "unfair" under the CPA—"are significant and, if decided

21 in plaintiff's favor, will go far in establishing both [her] individual claims and defendant's

22 liability to the absent class members." *High 5*, 2021 WL 211532, at *7. Just as in *High 5*, the

23 operation of Jackpot Party Casino is central to the claims of all putative class members. *See*

24 *Reichert*, 331 F.R.D. at 554-55 (finding predominance satisfied when all or nearly all elements of

25 the class's prima facie case presented common questions); *Taylor*, 2014 WL 6654270, at *16

26 (predominance satisfied where "predominant" issue contested by the parties was common to the

27 class). Class members' damages will vary, but "the need for individualized findings as to the

1   amount of damages does not defeat class certification," especially where there is a "valid

2   common method of calculating damages." *Bess v. Ocwen Loan Servicing LLC*, 334 F.R.D. 432,

3   436 (W.D. Wash. 2020) (internal quotations omitted); *Doyle v. Chrysler Grp., LLC*, 663 F.

4   App'x 576, 579 (9th Cir. 2016). Here, as in *High 5*, each class member's damages can be

5   assessed by summing all their spending at Jackpot Party Casino, and can be easily cross-checked

6   against transaction records subpoenaed from Facebook, Apple, Google, and Amazon, meaning

7   that "damage calculations will utilize information that is entirely computerized and available

8   from third parties." *High 5*, 2021 WL 211532, at *7; Logan Decl. ¶ 13 (explaining that Plaintiff

9   previously received limited data productions from Google and Apple, and will upon filing this

10   motion serve new subpoenas to Facebook, Apple, Google, and Amazon).

11          Defendant is likely to raise two issues with respect to the predominance inquiry, but

12   neither stands in the way of class certification. First, Defendant may point to its various attempts

13   to foist arbitration pacts upon its players as a basis to deny certification. Beginning in August

14   2019—more than a year after this class action lawsuit was filed—SciPlay updated its Terms of

15   Service and inserted a pop-up window in Jackpot Party Casino and its other social casino games.

16   *See* Dkt. 82 at 3. This pop-up included a link to the updated Terms and forced at least some users

17   to click "Accept" before being allowed to access Jackpot Party Casino, including any virtual

18   chips they had already paid for. *Id.* at 4 (screenshot of 2019 pop-up); Dkt. 83 ¶ 6. The updated

19   Terms purported to bind users—including putative class members—to an arbitration clause,

20   along with a class action and jury waiver and other conditions. Dkt. 83-1 ¶¶ 19-20 (Terms of

21   Service). The 2019 pop-up did not inform the putative class members of the pending class action.

22   *Id.* Then, in 2020, Scientific Games began rolling out a new, revised pop-up in Jackpot Party

23   Casino and its other social casino games. This pop-up also purported to bind users to Terms of

24   Service that included an arbitration provision. *See* Logan Decl. ¶ 14, Exhibit 6 (screenshot of

25   2020 pop-up). Scientific Games may argue that these pop-ups create a roadblock to

26   predominance, since presumably some players clicked "Accept" to one or both of the pop-ups

27   and others did not. That argument fails.

Mot. For Class Cert. and Prelim. Inj.
Case No. 18-cv-565-RSL - 15

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

1    As an initial matter, whether some putative class members may or may not be bound by

2    an arbitration clause is not an issue that defeats class certification. The Supreme Court has made

3    clear that the existence of "affirmative defenses peculiar to some individual class members" does

4    not defeat predominance, even if those defenses must be tried separately. *Tyson Foods*, 136 S.

5    Ct. at 1045. Accordingly, district courts routinely find that the "presence of agreements to

6    arbitrate with some of the unnamed Class members does not defeat class certification." *Mora v.

7    Harley-Davidson Credit Corp.*, No. 1:08-cv-01453, 2012 WL 1189769, at *13 (E.D. Cal. Apr. 9,

8    2012), *report and recommendation adopted*, 2012 WL 3245518 (E.D. Cal. Aug. 7, 2012); *Davis

9    v. Four Seasons Hotel Ltd.*, No. 08-cv-00525, 2011 WL 4590393, at *4 (D. Haw. Sept. 30, 2011)

10   ("The possibility that [defendant] may be able to compel unnamed members of the putative class

11   to arbitrate in the future does not preclude class certification."). Here, members of the proposed

12   classes who quit playing Jackpot Party Casino in 2014, 2015, 2016, or 2017 never even saw

13   Defendant's arbitration pop-up. And presumably, some portion of players who were presented

14   with Defendant's arbitration pop-up declined to click "I accept." In other words, Defendant's (in

15   any event unmeritorious) arbitration defense is limited to just a fraction of the proposed classes,

16   and consequently poses no bar to certification here.

17   In any event, to the extent that Defendant asserts that its pop-ups created enforceable

18   arbitration agreements with some subset of the proposed classes, the pop-ups are unenforceable

19   (among other reasons) because they were improper communications with absent putative class

20   members. Plaintiff has already argued that the 2019 pop-up is unenforceable so will not reiterate

21   those arguments here. *See* Dkt. 88 (Plaintiff's Opposition to Scientific Games Motion to Compel

22   Arbitration). The 2020 pop-up is unenforceable for similar reasons. *Cf. Kater v. Churchill

23   Downs, Inc.*, 423 F. Supp. 3d 1055, 1062-63 (W.D. Wash. 2019) (addressing similar pop-up

24   campaign by the defendants in that case, and finding that the pop-ups were coercive and

25   misleading). As in *Kater*:

26   The pop-up message presents putative class members with a stark choice: relinquish
     your class action rights and continue playing or maintain your rights and forfeit
27   access to [defendant's] games. This ultimatum is made more coercive by the

1
2

addictive nature of [defendant's] games and the fact that many players have already purchased chips that can only be accessed by agreeing to the terms. . . . With such pressures at play, the pop-up, and revised Terms, are clearly intended to steer putative class members away from participating in these cases.

3   *Id.* at 1062-63. When—as here—a defendant makes an improper communication to a putative

4   class member attempting to bind them to a rights-altering agreement, courts have not hesitated to

5   find the agreement unenforceable. *See, e.g.*, *Jimenez v. Menzies Aviation Inc.*, No. 15-cv-02392,

6   2015 WL 4914727, at *5 (N.D. Cal. Aug. 17, 2015); *In re Currency Conversion Fee Antitrust*

7   *Litig.*, 361 F. Supp. 2d 237, 254 (S.D.N.Y. 2005); *Balasanyan v. Nordstrom, Inc.*, No. 10-cv-

8   2671, 2012 WL 760566, at *3-4 (S.D. Cal. Mar. 8, 2012); *OConner v. Agilant Sols., Inc.*, 444 F.

9   Supp. 3d 593, 603 (S.D.N.Y. 2020); *McKee v. Audible, Inc.*, No. 17-cv-1941, 2018 WL

10   2422582, at *8 (C.D. Cal. Apr. 6, 2018); *Piekarski v. Amedisys Ill., LLC*, 4 F. Supp. 3d 952, 956

11   (N.D. Ill. 2013); *Degidio v. Crazy Horse Saloon & Rest. Inc.*, 880 F.3d 135, 138, 144 (4th Cir.

12   2018). Thus, in addition to affecting only a small fraction of the proposed classes, any defense

13   based on Defendant's pop-up campaign is without merit.

14                    2.      *A class action is superior to separate actions.*

15          A class action is also the superior method for fairly and efficiently adjudicating this

16   controversy. The superiority criterion encompasses at least four considerations: "(A) the class

17   members' interests in individually controlling the prosecution or defense of separate actions; (B)

18   the extent and nature of any litigation concerning the controversy already begun by or against

19   class members; (C) the desirability or undesirability of concentrating the litigation of the claims

20   in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P.

21   23(b)(3). As the Court found in *High 5*, class treatment is superior in these cases. 2021 WL

22   211532, at *7-8.

23          While many class members have suffered substantial monetary losses, all pale in

24   comparison to the costs of litigating against Scientific Games and its fleet of Perkins Coie and

25   Bartlit Beck attorneys. *See id.* at *7. Turning to the second factor, the high litigation costs help

26   explain why—at least as far as Plaintiff's counsel is aware—no individual actions have *ever* been

27   filed alleging these sorts of claims against Defendant. *See id.* ("Because the class members

would have little interest in pursuing individual actions, the first factor weighs in favor of class action."). Third, this forum is the clear choice in which to concentrate the litigation. *See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, No. 2:16-cv-1211 WBS AC, 2019 WL 358517, at *6 (E.D. Cal. Jan. 29, 2019) ("The fact that all remaining claims are brought under California law weighs in favor of a California federal court adjudicating the dispute."). This Court is already intimately familiar with the facts and law underlying this action because it presides not only over this action but also six related cases. It would make little sense to force the parties to start over elsewhere. *See Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 560 (W.D. Wash. 2008) (finding the forum superior because "the Court is already familiar with [p]laintiffs' claims"). Fourth, there are no intractable manageability issues. As in *High 5*, "[t]he computerized nature of the conduct at issue will make identifying class members fairly straightforward and will ensure that discovery on a classwide basis is comparatively manageable." 2021 WL 211532, at *8. In all, "this single class action will require fewer judicial (and defense) resources than managing separate suits brought by the admittedly numerous individuals who make up the class." *Id.*

Because Plaintiff has met the requirements of Rule 23(a), because issues common to all members of the proposed Damages Class predominate over any individual issues, and because a class action is the superior method of resolving this dispute, the Court should certify Plaintiff's proposed Damages Class.

C.      The Injunction Class Satisfies Rule 23(b)(2).

Fed. R. Civ. P. 23(b)(2) permits certification of a class seeking injunctive relief when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The rule requires the targeted conduct of the defendant be "indivisible . . . such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. Rule 23(b)(2) certification is appropriate when a single injunction would address the claims of every class member. *See B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019).

Edelson PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

Like the plaintiff in *High 5*, Plaintiff's "theory of the case is that the gambling games developed and operated by defendant cause compensable loss to every player who purchases virtual coins within the applications. This conduct is generally applicable to the class and, if [P]laintiff is able to prove the elements of [her] claims, final injunctive or declaratory relief applying to the class as a whole would be appropriate." 2021 WL 211532, at *8. Defendant's operation of an unlawful social casino is indivisible, affects all users of Jackpot Party Casino, and threatens all users with harm. Certification of the proposed Injunction Class is proper even though not all members of that Class have suffered the monetary harm that Reed did. *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) ("Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate [under Rule 23(b)(2)]."); *High 5*, 2021 WL 211532, at *9 (certifying injunctive class of "[a]ll individuals in Washington who played either High 5 Casino or High 5 Vegas," regardless of whether they purchased any virtual chips). Because a single injunction would address the claims of every user, the Court should certify the proposed Injunction Class under Rule 23(b)(2). *See Walters v. Reno*, No. 94-cv-1204, 1996 WL 897662, at *8 (W.D. Wash. Mar. 13, 1996) (noting that Rule 23(b)(2) certification is appropriate when "the opposing party has acted consistently towards members of the class") (internal quotations omitted); *see also* RCW 9.46.250(l) ("All gambling premises are common nuisances and shall be subject to abatement by injunction or as otherwise provided by law.").

## II.     The Court Should Issue A Preliminary Injunction.

In addition to requesting certification of the proposed Injunction Class, Plaintiff also moves for entry of the following preliminary injunction.

### [PROPOSED] PRELIMINARY INJUNCTION

Pending final disposition of this case, Scientific Games is enjoined from any of the following activities:

   a.   Collecting or otherwise obtaining any revenues related to the sale or use of Jackpot Party Casino, Gold Fish Casino, Quick Hit Slots, or Hot Shot Casino virtual casino chips to consumers in Washington.

b. Permitting any of its intellectual property, including its intellectual property licensed to SciPlay under the IP License Agreement described in Exhibit 3 at ECF 19, from being used in connection with the sale or use of Jackpot Party Casino, Gold Fish Casino, Quick Hit Slots, or Hot Shot Casino virtual casino chips to consumers in Washington.

c. Furnishing any services to SciPlay, including any services provided for under the Intercompany Services Agreement described in Exhibit 3 at ECF 151, in connection with the sale or use of Jackpot Party Casino, Gold Fish Casino, Quick Hit Slots, or Hot Shot Casino virtual casino chips to consumers in Washington.

Further, pending final disposition of this case, Scientific Games shall exercise all voting and control powers described in Exhibit 3 at ECF 54—including removal and appointment of SciPlay's board members, if necessary—to cause SciPlay to cease selling Jackpot Party Casino, Gold Fish Casino, Quick Hit Slots, and Hot Shot Casino virtual casino chips to consumers in Washington.

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All four factors are satisfied here.

A.    Plaintiff is Likely to Succeed on the Merits.

Plaintiff seeks relief under both the Washington gambling statute and the Washington Consumer Protection Act. She is likely to succeed on the merits of both claims.

1.    *Washington gambling law.*

First, Plaintiff is likely to succeed on her claim that the Jackpot Party Casino constitutes illegal gambling under Washington's gambling law. The Ninth Circuit has already held that online casino apps where players buy and wager virtual chips fall within the statute's definition of illegal gambling. *Kater*, 886 F.3d at 788. As in *Kater*, the Jackpot Party Casino app allows players to purchase virtual chips and wager them on games of chance. While Defendant claims that its casinos are distinguishable from the casino at issue in *Kater*, Plaintiff is likely to prevail in showing that they are not.

Defendant has attempted to distinguish its casinos from the casinos in *Kater* by claiming that players can "play for free, can continue to play for free, and no payment for extended play is ever needed." Dkt. 28 at 14. The Court rejected this argument at the motion to dismiss stage,

finding that even if "Scientific's players could wait an hour or so for another free spin[,] [n]onetheless, . . . the credits and coins are a 'thing of value' because they extend the privilege of playing a game that would otherwise cost money." *Fife v. Sci. Games Corp.*, No. 2:18-cv-00565-RBL, 2018 WL 6620485, at *4 (W.D. Wash. Dec. 18, 2018). The Court has reached similar conclusions in many other related cases. Plaintiff is likely to succeed in establishing that Jackpot Party Casino is not materially distinguishable from the virtual casino at issue in *Kater*, that it is therefore unlawful gambling under Washington law, and that Plaintiff and the proposed classes are thus entitled to relief under the Washington gambling statute.

### 2.    Consumer Protection Act.

Plaintiff is also likely to succeed on the merits of her CPA claim. "To prevail on a CPA action, the plaintiff must prove an '(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation.'" *Klem v. Washington Mut. Bank*, 295 P.3d 1179, 1185 (Wash. 2013) (quoting *Hangman Ridge*, 719 P.2d at 533). Plaintiff will be able to establish each of these elements.

Factors (2), (4), and (5)—injury to Plaintiff caused by conduct occurring in trade or commerce—are straightforward. Defendant's operation of virtual slot machines and its selling of virtual chips to feed those slots—though unlawful—occurs in trade or commerce. *See* RCW 19.86.010(2) ("'Trade' and 'commerce' shall include the sale of assets or services . . . ."); RCW 19.86.010(3) ("'Assets' shall include any property, tangible or intangible, . . . and any other thing of value."). This conduct caused Plaintiff (and all other members of the proposed Damages Class) to lose money purchasing virtual chips, which satisfies both the injury and causation elements. *See Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 899 (Wash. 2009) ("[T]he injury requirement is met upon proof the plaintiff's . . . money is diminished[.]") (internal quotations omitted); *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 170 P.3d 10, 22 (Wash. 2007) (establishing proximate cause—*i.e.*, that "but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury"—as the standard of

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

causation).

Factor (3)—the "public interest impact" element—is likewise easy to establish here. This requirement is satisfied *per se* by "showing that a statute has been violated which contains a specific legislative declaration of public interest impact." *Hangman Ridge*, 719 P.2d at 538. The Washington gambling statute—which, as explained above, Plaintiff will almost certainly prevail in showing Defendant violated—has such a declaration. RCW 9.46.010 (setting forth "[t]he public policy of the state of Washington on gambling"); *G.G. v. Valve Corp.*, No. 16-cv-1941, 2020 WL 7385710, at *7 (W.D. Wash. Dec. 16, 2020) (noting that public policy declarations in gambling statute "serve only to establish that a violation of the statute has a public interest impact"). In any case, this factor would be satisfied here even absent the gambling statute's declaration of public interest. The point of the public interest impact requirement is to avoid turning every one-off private dispute into a CPA claim. *See Hangman Ridge*, 719 P.2d at 538 ("Ordinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting the public interest."); *cf. T-Mobile USA*, 115 F. Supp. 3d at 1196-97 ("The dispute that T-Mobile has pleaded [misappropriation of trade secrets] is, the court concludes, a private one."). Here, however, other consumers "have been or will be injured in exactly the same fashion" as Reed has, transforming an otherwise private dispute into one that affects the public interest. *Hangman Ridge*, 719 P.2d at 538.

Finally, Plaintiff is likely to succeed in establishing factor (1)—that Defendant's operation of Jackpot Party Casino is an "unfair" act or practice. The CPA does not define "unfair." Indeed, as the Washington Supreme Court has noted:

> It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again.

*Klem*, 295 P.3d at 1187 (internal quotations omitted). Thus, rather than specific definitions, broad standards exist to guide courts and juries in determining whether conduct is "unfair" under the CPA. For example, "[the Washington] Supreme Court has suggested a defendant's act or

1  practice might be unfair if it causes or is likely to cause substantial injury to consumers which is

2  not reasonably avoidable by consumers themselves and is not outweighed by countervailing

3  benefits." *Mellon*, 334 P.3d at 1126 (internal quotations omitted). "Similarly, a defendant's act or

4  practice might be unfair if it offends public policy as established by statutes or the common law,

5  or is unethical, oppressive, or unscrupulous, among other things." *Id.* (internal quotations

6  omitted).[3]

7        Under any of these standards, Plaintiff is likely to prevail in establishing that Defendant's

8  operation of Jackpot Party Casino is an unfair practice. Most obviously, Defendant's operation of

9  an illegal casino is unfair because "it offends public policy as established by statutes." *Id.* The

10  gambling statute expressly states that "[t]he public policy of the state of Washington on

11  gambling is . . . to promote the social welfare of the people by limiting the nature and scope of

12  gambling activities," and "to restrain all persons from seeking profit from professional gambling

13  activities in [Washington]." RCW 9.46.010. As explained above, Plaintiff is likely to succeed in

14  showing that Jackpot Party Casino is outside the "nature and scope of gambling activities"

15  authorized by the statute. And, as explained more fully below, she is likely to succeed in

16  showing that, by operating the Casino, Defendant makes handsome profits on the backs of

17  vulnerable problem gamblers. Such conduct offends the explicit Washington public policy of

18  restraining gambling profiteers and promoting social welfare. On that basis alone, the conduct is

19  "unfair" under the CPA.

20        In addition, Defendant's operation of Jackpot Party Casino is "unethical, oppressive, or

21  unscrupulous." *Mellon*, 334 P.3d at 1126. SciPlay's suite of games brought in $582 million of

22  revenue in 2020, *see* Exhibit 2 at 97, and Jackpot Party Casino alone accounted for 48% of that

23  revenue, *see* Exhibit 4 at 12. But SciPlay and Scientific Games generate that revenue not by

24

25  [3]       The Washington Pattern Jury Instructions for CPA claims reflect the state's use of broad
   standards to determine whether a practice is "unfair." Rather than setting forth a particular
26  instruction defining "unfair" conduct (as they do for "deceptive" conduct), the Pattern
   Instructions instead provide commentary discussing *Klem* and *Mellon* "to assist practitioners in
27  developing their own instructional language in consumer cases." Wash. Pattern Jury Instr. Civ.
   310.08.

1    earning a reasonable amount of money from millions of paying customers. Instead, almost all of

2    that comes from a vulnerable population of problem gamblers who spend thousands upon

3    thousands of dollars they cannot afford to lose. *See id.* at 13 ("A small percentage of our players

4    account for nearly all of our revenue.").

5         Defendant's business model starts with its focus on replicating the land-based casino

6    experience. *See id.* at 6 ("[O]ur content library includes recognizable, real-world slot and table

7    games content from Scientific Games. This content allows players who like playing land-based

8    slot machines to enjoy some of those same titles in our free-to-play games."). By offering an

9    identical experience to land-based casinos, Jackpot Party Casino offers "an identical set of

10   associated dangers"—especially for players vulnerable to compulsive play. *See* Logan Decl.

11   ¶ 15, Exhibit 7 at 1 (Letter from Professor Natasha Dow Schüll to the Washington State

12   Gambling Commission). And it does so without the protections afforded to patrons of land-based

13   casinos. *See, e.g.*, RCW 9.46.071(b) (requiring licensed casinos to display informational signs

14   that include a toll-free hotline number for individuals who may have a gambling problem); RCW

15   9.46.071(d) (requiring licensed casinos to participate in a uniform self-exclusion program

16   through which individuals can voluntarily exclude themselves from multiple casinos); WAC

17   230-06-015 (requiring licensed casinos to bar individuals who appear to be intoxicated from

18   gambling).[4]

19

20   [4]    In addition to the formal protections afforded consumers by brick-and-mortar casinos,
     online casinos lack the informal protections provided by their real-world counterparts. For
21   example, online gambling from one's phone enables easy, 24-hour access, enhanced privacy
     (allowing problem gamblers to avoid social constraints and to hide their addiction from friends
22   and family), and a lack of tangible representations of money (like physical chips) to remind
     gamblers how much they have lost. *See* Jonathan Gottfried, *The Federal Framework for Internet
23   Gambling*, 10 Rich. J. L. & Tech. 26, 28 (2004); Christopher T. Pickens, *Of Bookies and
     Brokers: Are Sports Futures Gambling or Investing, and Does It Even Matter?*, 14 Geo. Mason
24   L. Rev. 227, 243 (2006); *see also* Declaration of Donna Reed ¶ 5 ("It's so easy to spend money
     from home so you keep purchasing because you don't realize how much you're spending at the
25   time. I work at a casino now and I don't gamble at all there; Jackpot Party makes it so easy to
     gamble from your own home."); Declaration of Robert Hicks ¶ 7 ("I have previously gambled in
26   Las Vegas and on a cruise, but these games are much different. When you're gambling in person,
     you have money in your hands and know when to stop playing. With online games, there is no
27   satisfaction, so you keep playing in hopes that you have money left.").

1    Defendant then focuses on the consumers it believes will best contribute to its bottom line

2 and adapts its games "to improve player engagement, increase paying player conversion and

3 drive per-player monetization." Exhibit 4 at 6. SciPlay brags to potential investors about its

4 ability to "further monetize our existing user base" using a "rigorous, data-driven acquisition,

5 engagement and monetization model." *Id.* at 6-7. Plaintiff is likely to prevail in establishing that

6 Defendant's mimicking of brick-and-mortar casinos without employing the protections required

7 of those casinos, coupled with its targeting of its most vulnerable users, is unethical, oppressive,

8 and unscrupulous. Thus, in addition to the fact that simply operating the unlawful casino offends

9 statutory public policy, the unethical, oppressive, and unscrupulous manner in which Defendant

10 operates it provides an independent basis for finding its conduct "unfair" under the CPA. *See*

11 *High 5*, 2021 WL 211532, at *9 (noting that intentionally targeting consumers who display

12 addictive tendencies could be unfair under CPA).

13    Yet another, independent reason why Defendant's conduct is "unfair" is that "it causes or

14 is likely to cause substantial injury to consumers which is not reasonably avoidable by

15 consumers themselves and is not outweighed by countervailing benefits." *Mellon*, 334 P.3d at

16 1126. The losses to consumers here are staggering. *See, e.g.*, Declaration of Laura Perkinson ¶ 3

17 ("between $10,000-$20,000"); Declaration of Donna Reed ¶ 3 ("at least $30,000"); Declaration

18 of Frank Wesner ¶ 6 ("at least $15,000, if not $25,000"); Declaration of John Gritsuk ¶ 1

19 ("approximately $40,000"); Declaration of Robert Hicks ¶ 5 ("at least ten thousand dollars");

20 Declaration of Ryan Westergreen ¶ 2 ("approximately $30,000"). And the injury to consumers is

21 not limited to money. *See infra* Section II.B (describing strained marriages and difficulty buying

22 food, among other stressors). Further, while some consumers may be able to moderate their

23 losses, the problem gamblers who provide almost the entirety of Defendant's revenues cannot

24 reasonably avoid the injury; their vulnerability is no match for Defendant's unchecked data

25 analytics and targeted gameplay manipulation. *See, e.g.*, Declaration of Laura Perkinson ¶¶ 4-5

26 ("I was addicted to Jackpot Party Casino and I hate that. . . . Once you get down to a lower

27 amount of coins they will instantly start flashing deals onto your screen. . . . A lot of these are

deals that you can't resist at all."); Declaration of Ryan Westergreen ¶ 4 ("The marketing is so strong, it really messes with your head. I could not say no, even if I knew I could not spend anymore."); Declaration of Frank Wesner ¶¶ 3-5 ("I used to have a problem gambling in casinos . . . . I switched from real-life casinos to playing Jackpot Party Casino because I thought that I could control it and afford it. . . . It feels like I'm getting back into my old routine."). There are no countervailing benefits to Defendant's operation of Jackpot Party Casino that could possibly outweigh these substantial consumer injuries.

Because Defendant's conduct offends public policy as established by the Washington gambling statute, involves unethical, oppressive, and unscrupulous practices, and causes substantial injury to consumers that is not reasonably avoidable and not outweighed by countervailing benefits, Plaintiff will be able to show that Defendant's conduct is "unfair" under the CPA. Consequently, as with her claim under the Washington gambling statute, Plaintiff is likely to prevail on the merits of her CPA claim.

B.    Continued Operation of Social Casinos Causes Irreparable Harm.

The second requirement for obtaining a preliminary injunction is irreparable harm. "Irreparable harm is presumed," however, "when a defendant engages in acts prohibited by a statute that provides for injunctive relief." *Earthwise Techs., Inc. v. Comfort Living, LLC*, No. 09-cv-5266, 2009 WL 2486159, at *8 (W.D. Wash. Aug. 12, 2009) (citing *Silver Stage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001)). Here, both the Washington gambling statute and the CPA—both of which, Plaintiff is likely to show, Defendant is violating—provide for injunctive relief. RCW 9.46.250 ("All gambling premises are common nuisances and shall be subject to abatement by injunction[.]"); RCW 19.86.090 ("Any person who is injured . . . by a violation of [the CPA] . . . may bring a civil action . . . to enjoin further violations[.]"). Irreparable harm is therefore presumed.

Regardless of this presumption, members of the proposed classes are suffering—and will continue to suffer—irreparable harm absent an injunction. On top of the monetary losses, Jackpot Party Casino is harming players' relationships with their families, *see* Declaration of

Donna Reed ¶ 6 ("I am going through a divorce right now, in part because of how much money I spent on Jackpot Party."); Declaration of Laura Perkinson ¶ 6 (explaining that she lied to her late husband about spending money on Jackpot Party Casino and she "hate[s] that [she] [has] to live with that now"), and making it difficult for some players to put food on the table, *see id.* ¶ 4 ("This kind of loss put a huge strain on my ability to even buy food since I had spent money on a stupid game."). If these Jackpot Party Casino players could stop gambling on their own, they would. But they cannot. *See, e.g.*, *id.* ¶¶ 4-5 ("I was addicted to Jackpot Party Casino . . . . [Y]ou can't resist [the offers for virtual chips] at all."); Declaration of Ryan Westergreen ¶ 4 ("The marketing is so strong, it really messes with your head. I could not say no, even if I knew I could not spend anymore."). So long as Jackpot Party Casino continues to sell chips, the victimization—and accompanying harm—will persist.

These harms are irreparable. After-the-fact money damages can't fix the strained marriages, the skipped meals, and the emotional distress caused by Defendant's continued unlawful activity. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) ("Because intangible injuries generally lack an adequate legal remedy, intangible injuries may qualify as irreparable harm.") (internal quotations omitted); *Chalk v. U.S. Dist. Ct. for C.D. Cal.*, 840 F.2d 701, 709-10 (9th Cir. 1988) (irreparable harm can include "emotional stress, depression and reduced sense of well-being"). Even harm that seems purely monetary can be irreparable when—as here—the losses become crippling. The loss of a business, for instance, is irreparable even though traditional monetary damages theoretically could compensate the plaintiff. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019). Members of the proposed classes are at risk of an analogous loss every day Defendant is allowed to continue operating Jackpot Party Casino, as the financial pressures placed on players by Defendant threaten their financial solvency. *See Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds* 562 U.S. 134 (2011) ("[T]he loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages.").

Edelson PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

C.     The Balance of Equities and Public Interest Favor an Injunction.

The remaining two elements of a preliminary injunction—that the balance of equities tip in favor of Plaintiff and that an injunction is in the public interest—are also met here. Because Plaintiff's claims are statutory, and because Plaintiff is likely to prevail on the merits of those claims, "the balance of hardships and public interest factors weigh in favor of a preliminary injunction." *Moreno Galvez v. Cuccinelli*, 387 F. Supp. 3d 1208, 1218 (W.D. Wash. 2019) (Lasnik, J.) (citing *Arizona Dream Act Coal.*, 757 F.3d at 1069). That's because "it is clear that it would not be equitable or in the public's interest to allow the [Defendant] to violate the requirements of [Washington] law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (internal quotations omitted). Both the gambling statute and the CPA set forth the explicit public policy of this state as including the protection of consumers through strict limitations on gambling activity and the prohibition on unfair trade practices. RCW 9.46.010; RCW 19.86.920. Given Plaintiff's likelihood of success on the merits of her statutory claims, coupled with the irreparable harms being incurred, it is neither equitable nor in the public interest to allow Defendant's continued violation of the two statutes. *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc.*, 725 F.3d 940, 946 (9th Cir. 2013) (where laws reflected strong public interest in safe navigation on the high seas, district court abused its discretion in denying ocean researcher's request for a preliminary injunction against dangerous interference with its marine operations).

## CONCLUSION

For all the foregoing reasons, Plaintiff asks the Court to (1) certify the Damages Class; (2) certify the Injunction Class; (3) appoint Donna Reed to represent both Classes; (4) appoint Edelson PC as counsel to both Classes; and (5) enter the proposed preliminary injunction.

Dated: April 9, 2021                    Respectfully submitted,

                                        **DONNA REED,** individually and on behalf of all others
                                        similarly situated,

**EDELSON PC**
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378

1   By: /s/ Todd Logan

2   Rafey S. Balabanian*
3   rbalabanian@edelson.com
    Todd Logan*
4   tlogan@edelson.com
    Brandt Silver-Korn*
5   bsilverkorn@edelson.com
6   EDELSON PC
    123 Townsend Street, Suite 100
7   San Francisco, California 94107
    Tel: 415.212.9300 / Fax: 415.373.9435
8
9   By: /s/ Alexander G. Tievsky

10  Jay Edelson*
    jedelson@edelson.com
11  Alexander G. Tievsky, WSBA #57125
    atievsky@edelson.com
12  Amy B. Hausmann*
    abhausmann@edelson.com
13  EDELSON PC
14  350 North LaSalle Street, 14th Floor
    Chicago, Illinois 60654
15  Tel: 312.589.6370 / Fax: 312.589.6378

16  By: /s/ Cecily C. Shiel

17  Cecily C. Shiel, WSBA #50061
18  cshiel@tousley.com
    TOUSLEY BRAIN STEPHENS PLLC
19  1700 Seventh Avenue, Suite 2200
    Seattle, Washington 98101
20  Tel: 206.682.5600

21  *Admitted pro hac vice

22  Attorneys for Plaintiff and the Putative Class
23

24

25

26

27

EDELSON PC
350 N LaSalle Street, 14th Floor, Chicago, IL 60654
Tel: 312.589.6370 • Fax: 312.589.6378